03-1727-cr
U.S.A. v. Boyd (Burden)

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2007

(Argued: May 9, 2008                    Decided: March 31, 2010

Docket No. 03-1727-cr-LEAD, 03-1728-cr-XAP, 03-1729-cr-CON, 03-1779-cr-CON, 04-2737-cr-CON, 06-0519-cr-CON, 06-2375-cr-CON

- - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,

Appellee-Cross-Appellant,

v.

DAVID L. BURDEN, ALSO KNOWN AS QUINTEN, ALSO KNOWN AS SID, KELVIN BURDEN, ALSO KNOWN AS WAFFLE, ALSO KNOWN AS UNCLE, ALSO KNOWN AS UNC, JERMAIN BUCHANAN, and DAVID M. BURDEN,

Defendants-Appellants-Cross-Appellees,

TERRENCE BOYD,

Defendant-Appellant.


- - - - - - - - - - - - - - - - - - - - - - - - - -x

Before:   HALL, LIVINGSTON, and JOHN R. GIBSON,* Circuit Judges.


Appeal from judgments of the United States District Court

for the District of Connecticut (Janet C. Hall, District Judge,

presiding), entered on November 13, 2003, December 5, 2003,

January 23, 2004, April 15, 2004, and June 3, 2004, following

jury trial verdicts for David L. Burden, Kelvin Burden, Jermain

_____

* The Honorable John R. Gibson, Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

Buchanan, and David M. Burden, and a plea of guilty by Terrance[1] Boyd on RICO and VCAR counts.  We affirm in part and remand for resentencing.

KEVIN J. O'CONNOR, United States Attorney, STEPHEN B. REYNOLDS, HAROLD H. CHEN, SANDRA S. GLOVER, Assistant United States Attorneys, for Appellee-Cross-Appellant.

ROBERT M. FROST, JR., ZELDES, NEEDLE & COOPER, P.C., for Defendant-Appellant-Cross-Appellee, David L. Burden.

JOSEPH A. BONDY, The Law Offices of Joseph A. Bondy, for Defendant-Appellant, Kelvin Burden.

JEREMIAH DONOVAN, WILLIAM T. KOCH, JR., for Defendant-Appellant-Cross-Appellee, Jermain Buchanan.

TIMOTHY P. ASPINWALL, for Defendant-Appellant, David M. Burden.

FRANCIS L. O'REILLY, for Defendant-Appellant, Terrence Boyd.

JOHN R. GIBSON, Circuit Judge.

This appeal arises out of a twenty-five count indictment alleging that the defendants were part of the Burden Organization, a racketeering enterprise engaged in the distribution of cocaine and cocaine base that also undertook violent acts to promote the enterprise's drug trafficking.

---

[1]The indictment and Buchanan's briefs on appeal refer to him as "Jermain."  The indictment and Boyd's briefs on appeal refer to him as "Terrance."  We assume both are correct and we direct the Clerk of the Court to amend the official caption to conform.

Defendants David L. Burden, Kelvin Burden, Jermain Buchanan, and David M. Burden were convicted by a jury following a month-long trial on multiple counts including violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1962, the Violent Crimes in Aid of Racketeering statute ("VCAR"), 18 U.S.C. § 1959, and conspiracy to distribute cocaine and cocaine base.  They challenge whether the murder and attempted murder of those they believed to be responsible for the death of a family member were sufficiently related to the enterprise alleged in the indictment, or were performed for the purpose of maintaining or improving their position in the enterprise, such that the murder and attempted murder could form the basis for the RICO and VCAR convictions.  All four defendants also allege that the government's summation was unfairly prejudicial, and each defendant raises individual issues as well. The remaining defendant on appeal, Terrence Boyd, pleaded guilty to one count of possessing with intent to distribute and distributing cocaine base.  He alleges that the district court unreasonably declined to resentence him on remand.  We address each argument in turn.

## Background

Terrence Boyd, Jermain Buchanan, and Kelvin, David M., and David L. Burden were among a group of people who trafficked cocaine and cocaine base in Norwalk, Connecticut from 1997 until

2001.  Kelvin Burden supervised the operation.  He had sources who supplied him with kilogram quantities of cocaine and cocaine base, he cooked the cocaine and repackaged the drugs for street-level sales, and over time he began coordinating distribution of the drugs to a number of street dealers.  He lived at 27 Lincoln Avenue, where the narcotics activity took place, members of the group congregated, and weapons were stored.  The government referred to it as "the stash house."  Other members of Kelvin's family also lived there from time to time during this period.  Kelvin was incarcerated twice during 2000, but he continued to direct operations from jail.

Beginning in 1998, the group's activities expanded to include violent acts used to promote its narcotics business and strengthen the organization's power.  Two separate disputes erupted.  The first was with members of the "Hill Crew," a group of people from the Hill section of Norwalk who were also involved in drug trafficking.  This dispute began in January 1998 when Willie Prezzie, a friend and relative of Kelvin, was attempting to collect on a drug debt from Hill Crew member Shaki Sumpter.  The debt arose when Prezzie fronted Shaki some drugs for street-level distribution and Sumpter failed to pay for them.  Sumpter arranged to meet Prezzie and Jermain Buchanan, purportedly to repay the debt.  When they met, Buchanan and Prezzie were in a car along with Sean Burden and Demetrius Story.  Buchanan was

4

driving.  Sumpter and fellow Hill Crew member Rodrick Richardson approached the car, both with guns pointed, and tried to rob Prezzie of money and marijuana.  As Buchanan drove away, Sumpter and Richardson fired shots at the car.  Sean Burden was struck by the gunfire but not killed.

When Prezzie told Kelvin about the incident, Kelvin wanted to retaliate.  He gave weapons stored at the Lincoln Avenue house to Buchanan and David M. Burden (also known as "DMX"), who went with Prezzie in search of Richardson and Sumpter.  They were not able to find them, so members of the Burden Organization did nothing more at the time.  However, two months later there was an exchange of gunfire between members of the Organization and the Hill Crew outside of the Lincoln Avenue house.

The second dispute was with Marque Young, a drug dealer to whom Kelvin had been supplying crack cocaine for resale.  Kelvin became upset with Young in May 1998 when Terrence Burden was injured in a fight and six days later his brother Sean was shot and killed.  Although Young was not directly involved in either incident, he was present at both and Kelvin held him responsible for Sean's fatal shooting.  Over the next several weeks Young exchanged taunts and insults with Kelvin, Jermain, and other members of the Burden family, and Kelvin and other members of the organization planned but never carried out acts of retaliation.  Ultimately, though, on July 1, 1999, Jermain Buchanan and another

person carried out a drive-by shooting in front of Young's house where Young and Derek Owens were sitting in Young's car.  Owens was killed and Young was wounded such that he is now a paraplegic.[2]

The violence between the Burden Organization and the Hill Crew resurfaced in June 1999.  Richardson, who had been involved in the attempted robbery of Prezzie a year and a half earlier, was at a bar known for drug trafficking at the same time Kelvin was there.  Richardson began chastising Kelvin for failing to avenge his brother Sean's death, accusing him of going on with his business and spending money on a Mercedes Benz instead of worrying about who killed his brother.  Richardson was outside the same bar the next night when Buchanan came running toward him and shot him.  A bullet hit Richardson in the elbow, paralyzing his arm.  A month or two later, David L. Burden (known as "QB") got in a dispute with Terra Nivens, a Hill Crew member, over Nivens's relationship with QB's sister.  Opposing members of the Burden Organization and the Hill Crew gathered and began facing off, threatening and taunting each other.  St. Clair Burden said he wanted to return to the Lincoln Avenue house to get his gun, and Mike Dawson, a Hill Crew member, stepped in and started firing shots into the car in which Kelvin was riding.  A bullet from Dawson's gun struck Kelvin in the chest.

---

[2]Buchanan was acquitted in Connecticut state court of wounding Young and murdering Owens.

Several additional instances of violence occurred between the Burden Organization and the Hill Crew in late 1998 and early 1999, most frequently involving members of the two groups shooting at each other with both sides vowing revenge. Ultimately, the violence ended when key members of the Hill Crew moved away or were incarcerated.

In connection with these incidents, the Burdens, Buchanan, and Boyd were charged in this multi-count indictment. All but Boyd were tried by a jury. Boyd entered a plea of guilty. The jury returned guilty verdicts on many of the counts. All four trial defendants were acquitted of Count Eleven, which charged VCAR attempted murder of Richardson, Hatton, and other members of the Hill Crew on October 10, 1999. The Burdens and Buchanan were all charged with and convicted of the substantive RICO count. Those four individuals were charged with various combinations of ten racketeering acts. The jury found the government proved seven racketeering acts for Kelvin Burden: drug conspiracy (Act 1); conspiracy to murder Rodrick Richardson (Act 2A); attempted murder of Rodrick Richardson on June 27, 1999 (Act 2C); conspiracy to murder Marque Young (Act 3A); attempted murder of Marque Young (Act 3B); murder of Derek Owens (Act 4); conspiracy to murder members of the Hill Crew from in or about August 1999, until on or about October 10, 1999 (Act 5A); and attempted murder of members of the Hill Crew on September 3, 1999 (Act 5B).

Kelvin was also found guilty of RICO conspiracy (Count Two); VCAR conspiracy to murder Rodrick Richardson in or about June 1999 (Count Three); VCAR attempted murder of Rodrick Richardson on June 27, 1999 (Count Five); VCAR conspiracy to murder Marque Young (Count Six); VCAR attempted murder of Marque Young (Count Seven); VCAR murder of Derek Owens (Count Eight); VCAR conspiracy to murder members of the Hill Crew (Count Nine); VCAR attempted murder of Fred Hatton and other members of the Hill Crew on September 3, 1999 (Count Ten); conspiracy to possess with intent to distribute and to distribute 5 kilograms or more of a mixture containing a detectable amount of cocaine, and 50 grams or more of a mixture or substance containing a detectable amount of cocaine base (Count Twelve); and possession with intent to distribute and distributing 5 grams or more of a mixture or substance containing a detectable amount of cocaine base (Count Fourteen). Kelvin was sentenced to life in prison.

Jermain Buchanan's RICO conviction was based on six racketeering acts, Acts 1, 2A, 2C, 3A, 3B, and 4. He was also convicted of Counts Two, Three, Five, and Twelve. Buchanan was sentenced to life in prison. David "DMX" Burden was convicted of racketeering based on Acts 1, 5A, and 5B. He was also convicted of Counts Two, Nine, Ten, and Twelve; four counts of narcotics distribution; and possession of a firearm during a drug trafficking crime (Count Seventeen). DMX was sentenced to 352

8

months in prison.  David "QB" Burden's RICO conviction was based on racketeering Acts 1,5A, and 5B.  He was also convicted of Counts Two, Nine, Ten, and Twelve.  QB received a sentence of 210 months' imprisonment.

The district court denied the motions for judgment of acquittal or new trial filed by David L. Burden, Kelvin Burden, Jermain Buchanan, and David M. Burden.  Each filed a timely notice of appeal.  Boyd was sentenced to 188 months' imprisonment and five years of supervised release following his guilty plea, and he too filed a timely notice of appeal.  Following the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), and this Court's decision in United States v. Crosby, 397 F.3d 103 (2d Cir. 2005), we remanded the cases of DMX Burden, QB Burden, and Jermain Buchanan upon the government's motion for possible resentencing and we sua sponte remanded Terrence Boyd's case.  The government filed no Crosby motion with respect to Kelvin Burden because he had received a mandatory life sentence.  The district court declined to resentence QB, Buchanan, and Boyd, but did hold a resentencing for DMX where he received a 264-month sentence, a reduction of 88 months.  The appeals were reinstated and we now consider the issues they raise.

I.

The trial defendants allege that the government failed to introduce sufficient evidence that they operated and managed a continuous enterprise engaged in a pattern of racketeering activity to support their convictions on the RICO and VCAR counts. They assert that the evidence showed no more than a group of people who sold drugs together, and did not show a well-defined organization with the requisite continuity or structure to constitute an enterprise. Simply stated, their argument is that the racketeering acts alleged in the indictment were attributable to various individuals, acting alone or with others, trying to settle personal beefs. Thus, they dispute that the evidence showed a pattern of racketeering activity because the individuals' actions were not related to activities of an enterprise.[3] Finally, they submit that the evidence failed to demonstrate that the trial defendants participated in the operation or management of an enterprise. We review a challenge to the sufficiency of the evidence by considering the evidence in the light most favorable to the government, giving credit to every inference the jury might have drawn in the government's favor. United States v. Dhinsa, 243 F.3d 635, 648 (2d Cir. 2001). We will affirm if any rational finder of fact could have

---

[3]Kelvin Burden also argues that the evidence does not show a pattern of racketeering activity because the acts were not related to each other.

10

found the essential elements of the crime beyond a reasonable doubt.  Id. at 649.  The weight of the evidence is not for us to consider, and thus any lack of corroboration is irrelevant because that speaks to the weight and not the sufficiency of the evidence.  See United States v. Hamilton, 334 F.3d 170, 179 (2d Cir. 2003).

A RICO conviction requires the government to prove that the defendant participated or conspired to participate, directly or indirectly, in the conduct of an enterprise through a pattern of racketeering activity.  United States v. Allen, 155 F.3d 35, 40 (2d Cir. 1998).

A.

A RICO enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct," proved by "evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit."  United States v. Turkette, 452 U.S. 576, 583 (1981).  An enterprise is an entity.  Id.  The trial defendants assert that, while the evidence showed that some members of the Burden family and a few of their friends were part of a group that bought and sold drugs, the group lacked the structure required of an enterprise.  They assert that no hierarchy was in place, which they contend argues against the existence of an enterprise.  They

11

also argue that the group lacked continuity because the alleged head of the organization, Kelvin Burden, was incarcerated twice during the time the enterprise is alleged to have existed.

The district court recognized the limitations of the evidence in this case. It noted that "[t]here was evidence to suggest that the Burden narcotics organization was not very structured, particularly in contrast to descriptions of other organizations contained in a number of Second Circuit opinions involving organized narcotics operations that also engaged in acts of violence and other criminal activities."[4] In addition, the district court pointed out that the evidence was "somewhat contradictory" but sufficient for a jury to reasonably conclude that the Burden organization had a "quasi-hierarchical structure."

Our deferential review, in which we make no credibility determinations, leads us to conclude that sufficient evidence exists to support the jury's finding that the Burden Organization constituted an enterprise. The Organization had multiple members who joined in the shared purpose of selling drugs and promoting such sales. They had a meeting place, the Lincoln Avenue house, where they were able to traffic drugs out of the public's eye, stored guns, and planned the violent acts they undertook. These

_____

[4]The district court cited United States v. Diaz, 176 F.3d 52 (2d Cir. 1999), and United States v. Concepcion, 983 F.2d 369 (2d Cir. 1992).

activities were orderly because there was a hierarchical structure in place.  Kelvin was the head of the Organization, controlling the flow of cocaine and cocaine base, organizing acts of violence, recruiting members, and directing members' activities.  One witness described him as the "mastermind." Kelvin gave orders to Lavon Godfrey, a dealer who looked to Kelvin as his sole supplier.  Kelvin asked Anthony Burden to serve as DMX's protector on the street, and he sold narcotics that were delivered by St. Clair, DMX, and Buchanan.  According to Anthony Burden, a cousin to all four trial defendants, DMX was a lieutenant who distributed drugs to street dealers who sold narcotics for the Burden Organization.  QB was a seller who also used guns when called upon to do so.  Buchanan was an enforcer and a dealer.  Anthony referred to the Burden Organization, of which he was a member, as the "Cream Team."

The record also contains evidence of other organizational structures.  Although Kelvin orchestrated retaliatory acts of violence in response to the shooting of Sean Burden in January 1998, Sean's murder in May 1998, and the shooting of QB in October 1999, other violence occurred after a number of members of the Organization agreed to it.  For instance, Lavon Godfrey testified that DMX, QB, St. Clair, and member Donny Thigpen jointly agreed to retaliate against members of the Hill Crew after Andre McClendon was shot.  St. Clair Burden announced that

13

he was going to terrorize Hill Crew members after Kelvin was shot. In the spring of 1999, Kelvin said that Richardson was the heart of the Hill Crew and needed to be dealt with sooner or later. When Buchanan told Lavon Godfrey that he had shot Richardson in June 1999, Kelvin said it was about time he did something. Later that summer, Godfrey heard DMX saying that they had "shot up the Hill."

The fact that there were different styles of organization between the narcotics business and the violent acts does not negate the jury's finding that the defendants were part of an enterprise. Boyle v. United States, 129 S.Ct. 2237, 2245 (2009). An established hierarchy is not essential to the existence of an enterprise. Id. ("[A]n association-in-fact enterprise . . . need not have a hierarchical structure or a 'chain of command'. . . ."); see, e.g., United States v. Mazzei, 700 F.2d 85, 87 (2d Cir. 1983) (group of players and bettors who conspired to fix basketball games constituted a RICO enterprise). We are mindful that "the existence of an association-in-fact is oftentimes more readily proven by what it does, rather than by abstract analysis of its structure." United States v. Coonan, 938 F.2d 1553, 1559 (2d Cir. 1991) (internal quotations and emphasis omitted). In this case, the drug operation and organized violence were fruits of an enterprise.

Although Kelvin and others argue that his two instances of

14

incarceration during the year 2000 interrupted the continuing nature of the enterprise, the record reveals that he continued to direct operations from jail.  Although Kelvin had been the cook, Willie Prezzie took over that responsibility.  Kelvin told Prezzie how to dole out the drugs to DMX for distribution, and Anthony looked out for DMX during that time.  Neither Anthony nor DMX contacted the Organization's suppliers while Kelvin was incarcerated because it was not their role to do so.  When Kelvin was released, the Organization's drug sales increased and Anthony was able to return to selling, but the operations had in no way ceased while Kelvin was away.  A period of quiescence in an enterprises's course of conduct does not exempt the enterprise from RICO.  Boyle, 129 S.Ct. at 2245. We conclude that the members functioned as a continuing unit.

### B.

The trial defendants next assert that the government failed to introduce sufficient evidence that the predicate acts alleged in the racketeering counts formed a pattern of racketeering activity.  The government must prove both that an enterprise exists and that the conduct in furtherance of the enterprise comprises a pattern.  While the RICO enterprise is an entity, the "pattern of racketeering activity" is "a series of criminal acts as defined by the statute."  Turkette, 452 U.S. at 583.  Such

15

conduct forms a pattern under RICO when it "embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events."  H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 240 (1989) (quoting the pattern definition from the Dangerous Special Offender Sentencing Act, 18 U.S.C. § 3575(e) (now repealed), and adopting it for RICO).  At least two predicate acts are required to prove a pattern, and the acts must be related and "amount to or pose a threat of continued criminal activity."  United States v. Minicone, 960 F.2d 1099, 1106 (2d Cir. 1992) (quoting H.J. Inc., 492 U.S. at 239).  The requirements of relatedness and continuity protect defendants from RICO charges based on isolated or sporadic criminal acts. United States v. Diaz, 176 F.3d 52, 93 (2d Cir. 1999).  The trial defendants challenge the horizontal[5] and vertical relatedness and the alleged continuity of the activity.

Horizontal relatedness requires that the racketeering predicate acts be related to each other.  However, that relationship need not be direct; an indirect relationship created by the relationship of each act to the enterprise will suffice.

---

[5]DMX and QB Burden have conceded that the jury had a basis upon which to find horizontal relatedness.  Both defendants made that concession in their new trial motions before the district court, and QB Burden repeated it in his brief before this court.

16

United States v. Polanco, 145 F.3d 536, 541 (2d Cir. 1998) ("A predicate act is related to a different predicate act if each predicate act is related to the enterprise."). Vertical relatedness means that the acts are related to the enterprise. It requires that the defendant was enabled to commit the offense solely because of his position in the enterprise or his involvement in or control over the enterprise's affairs, or because the offense related to the activities of the enterprise. United States v. Daidone, 471 F.3d 371, 375 (2d Cir. 2006) (per curiam). Although the government must provide sufficient evidence of each kind of relatedness, "both the vertical and horizontal relationships are generally satisfied by linking each predicate act to the enterprise. This is because predicate crimes will share common goals . . . and common victims . . . and will draw their participants from the same pool of associates (those who are members and associates of the enterprise)." Id. at 376.

The law also requires that the predicate acts reveal continued racketeering activity or the threat thereof. Diaz, 176 F.3d at 93. "Continuity is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." H.J. Inc., 492 U.S at 241.

The district court concluded that the government had

17

successfully demonstrated a pattern of racketeering activity with respect to each of the four trial defendants. While there is some duplication of the predicate act counts on which they were convicted, not all are the same. All four were convicted of predicate Act 1, drug conspiracy, but they do not challenge the existence of a pattern of racketeering activity with respect to that act. The three Burdens were convicted of Acts 5A and 5B, conspiracy to and attempt to murder members of the Hill Crew. Kelvin and Buchanan were also convicted of Acts 2A and 2C, conspiracy to and attempt to murder Rodrick Richardson; Acts 3A and 3B, conspiracy to and attempt to murder Marque Young; and Act 4, the murder of Derek Owens.

Our review of the record leads us to the same conclusion; sufficient evidence exists to support a finding that each of the four trial defendants was engaged in a pattern of racketeering. We reach this conclusion even though the violent acts in this case are the type of conduct that the defendants could have committed absent a connection to the enterprise. The government advanced four theories of relatedness before the district court, and it repeats them on appeal. The government asserts that the Hill Crew members were significant drug traffickers in the Carlton Court/Hill section of Norwalk and their continued success was inconsistent with the Burden Organization's success. Second, the government points to the genesis of the beef with the Hill

18

Crew as Richardson's failure to pay Prezzie for crack cocaine and Richardson's acts of violence when Prezzie and Buchanan tried to collect the debt. Third, the government asserts that the Lincoln Avenue house served as the intersection of drug activity (storage, preparation, packing, and distribution) and violence (storage of guns and planning violent acts). Finally, the government contends that the relationship between the violence and the Burden Organization's drug trafficking was apparent from evidence that its violent acts increased respect for the Organization in the South Norwalk drug market.

The evidence does not support the theory that the Burden Organization's success in dealing drugs was enhanced by cutting into the sales made by the Hill Crew. While there was testimony that some members of the Hill Crew (including Richardson) dealt crack cocaine, there was no evidence that they were dominant or significant drug dealers.

It is possible, however, to credit the violence that occurred in 1998 between Richardson and Sean Burden, Prezzie, and Buchanan as being the genesis of the two groups' disputes. Shaki Sumpter, a Hill Crew member, owed a drug debt to Prezzie. Sumpter and Richardson decided to rob Prezzie instead of paying him. When they fired shots into the vehicle Prezzie was in they struck Sean Burden, who was also in the vehicle along with Buchanan. These shots were not fatal; Sean was killed in a later

19

incident.  The taunts and retaliation began after this incident, however.  After Sean was killed, Richardson called Kelvin a coward and chided him for buying an expensive car and going on with his drug business instead of avenging his brother's death. Richardson, in turn, was shot.

With respect to the third theory, the fact that the acts of violence were discussed at the same location where narcotics activity took place does not in and of itself establish vertical relatedness.  There was no testimony to the effect that the meetings at the Lincoln Avenue house were used to plan or organize precise acts of violence.

Finally, the government argues that the following testimony from Anthony Burden sufficiently establishes its theory that violence enhanced the level of respect afforded the Burden Organization in the South Norwalk drug market.

> Q: Now, you indicated yesterday that between '97 –
> well, between '97 and your arrest in 2001, you
> held a certain position amongst this group, is
> that accurate?
> A: Yes.
>     . . .
> Q: All right. And did this – you indicated the group
> was organized?
> A: Yes.
> Q: All right.  Was it important to you, in your
> position, to have respect?
> A: Yes.
> Q: Okay.  In your view, did you have respect on the
> street?
> A: Yes.
> Q: And why was this important to you?  Why was that
> important, as far as it concerned this group?
> A: Because if they don't respect you, they just run

```
          all over you.
Q:   What do you mean by that?
A:   You give somebody an assignment, they don't pay
     it, hey, you ain't getting paid.  You got to have
     respect for this.
Q:   How do you earn respect?
A:   You know, beat a couple people up.  Whatever.
Q:   Can you earn respect by engaging in violence?
A:   Yes.
Q:   Does violence, as far as you understand, enhance your
     image in the group?
A:   Yes.
     . . .
Q:   Well, as far as you understand, were you expected
     to do certain things on the street, to maintain
     your reputation?
A:   If it occurred, yes.
Q:   And by engaging in and showing strength, did you
     increase your prestige in the group? . . . [D]id
     it enhance your reputation?
A:   Yes.
```

The tenor of this colloquy suggests that a certain type of persona is necessary to run and maintain a group of drug dealers as an organization.  It does not speak specifically to the reason for violence towards Richardson, Young, and Owens.  However, looking at the record as a whole, we conclude that a jury could reasonably find that the acts of violence were all vertically related to the enterprise and its business of drug trafficking. The targets of the violence were other drug dealers.  Richardson was the "heart" of the Hill Crew whom Kelvin said needed to be dealt with.  All of the charged acts were retaliation for a taunt or an act of violence directed at a member of the Burden Organization.  For instance, after Kelvin was shot, another member of the Burden family said he was going to "terrorize" the

21

Hill.  The respect Anthony Burden spoke of is that which is perhaps essential to running a drug dealing enterprise, and the jury could reasonably have inferred that the charged acts of violence were related to the enterprise because they were conducted to protect the Burden Organization's members and garner them respect in the drug community.  In addition, Kelvin was said to hold Young responsible for Sean's death, and the violence that resulted in Young's injury and Owens's death was related to that belief.  In sum, the jury could reasonably have inferred that the acts of violence were related to the enterprise.  See United States v. Simmons, 923 F.2d 934, 951-52 (2d Cir. 1991) (murders were related to affairs of narcotics enterprise because they were intended to help protect it from external challenges by retaliating against aggression).

A pattern of racketeering also requires that "the predicates themselves amount to, or . . . otherwise constitute a threat of, continuing racketeering activity."  H.J. Inc., 492 U.S. at 240. The trial defendants dispute the continuity of the charged acts, but we conclude that the nature of the enterprise itself provided sufficient evidence of its continuity.  "Where the enterprise is an entity whose business is racketeering activity, an act performed in furtherance of that business automatically carries with it the threat of continued racketeering activity."  United States v. Indelicato, 865 F.2d 1370, 1383-84 (2d Cir. 1989).  The

22

government established a link between the Burden Organization's narcotics activity and violence for the purpose of protecting and furthering its narcotics business, and that provides sufficient proof of the threat of continuing racketeering activity.

C.

DMX and QB Burden argue that insufficient evidence existed that they conducted or participated in the affairs of the enterprise, as is required for a RICO conviction. Case law holds that this element means a defendant must participate in the operation or management of the enterprise itself and play "some part in directing the enterprise's affairs." Reves v. Ernst & Young, 507 U.S. 170, 179 (1993). This does not mean, however, that one must act in a managerial role. It is sufficient to be a lower-level participant and still be liable for directing the enterprise's affairs if one "exercise[s] broad discretion" in carrying out the principal's instructions. United States v. Diaz, 176 F.3d 52, 92 (2d Cir. 1999).

QB argues that he was on the periphery of the narcotics conspiracy and that his involvement in the conspiracy and attempt to murder members of the Hill Crew was unorganized and motivated by personal revenge. DMX argues that no organization existed, and even if it did, he was doing nothing more than taking orders. The evidence supports the jury's finding that both men

23

participated in the affairs of the enterprise.  QB sold drugs, he was part of the group (along with DMX) that decided how the Burden Organization should retaliate for Andre McClendon's shooting and other retaliatory acts, he kept a gun in his bedroom at the Lincoln Avenue house, and he allowed another Organization member to borrow his gun when the member worried that Marque Young might come after him.

DMX, who lived at the Lincoln Avenue house, was a key member of the drug distribution network.  He also helped funnel money back to Kelvin and ultimately to Kelvin's father, the keeper of the proceeds.  He was involved in at least two shooting incidents with members of the Hill Crew.  He and QB were part of a group that left the Lincoln Avenue house after McClendon was shot. When they returned, DMX said they had "shot up" the Hill and he and QB identified which guns stored in the Lincoln Avenue house they had used.

The jury could reasonably have inferred that both DMX and QB Burden conducted or participated in the affairs of the enterprise.

D.

Buchanan argues that the RICO violent acts of which he was convicted occurred before an enterprise existed and thus his conviction should be reversed.  The shootings of Young and Owens

and the attempted murder of Richardson all took place in 1999. The record reveals that sufficient evidence existed to support a finding that the narcotics operation began in 1997, and specifically that Buchanan was an "enforcer" for the Organization during that year.  We find no merit in his argument.

Buchanan further argues that the evidence was insufficient to show that Richardson's shooting was an attempt or a conspiracy to murder him.  He asserts that shooting someone in the elbow is evidence of intent to wound and not to kill.  We easily conclude that the jury could reasonably infer that Buchanan's acts of pointing a handgun at Richardson, firing it in his direction, and striking him in the front side of his arm constitute an intent to kill.

## II.

The trial defendants were all found guilty of one or more VCAR counts in violation of 18 U.S.C. § 1959.  A VCAR conviction requires the government to prove that the organization was a RICO enterprise, that the enterprise was engaged in racketeering activity as defined by RICO, that each defendant had a position within the enterprise, and that each committed the crime of violence "'for the purpose . . . of maintaining or increasing [his] position in' the enterprise."  See United States v. Concepcion, 983 F.2d 369, 381 (2d Cir. 1992) (alteration in

25

original) (quoting § 1959).  The trial defendants now challenge the sufficiency of the evidence that they committed the violent crimes of which they were convicted for the purpose of maintaining and increasing their positions in the Burden Organization.

This Court has rejected the notion that the "for the purpose of" element must be the defendant's sole or principal motive. "We consider the motive requirement satisfied if the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership." Id.  The jury could have inferred the defendants' motives from the testimony of several witnesses.  The first was Anthony Burden's testimony that threats and acts of violence, along with a general reputation for violence, were essential to one's success and enhanced a member's standing in the Burden Organization.  He described an overall climate of violence as integral to a member's success in the Organization.  Kelvin was clearly the leader of the Organization. Lavon Godfrey, who sold narcotics with the Burden Organization from the spring of 1998 until the summer of 2001, testified that Kelvin was the mastermind who began distributing to street dealers in 1999.  Kelvin made it clear that Godfrey could sell only for his organization.  While Kelvin was incarcerated during

26

2000, Anthony Burden and Prezzie testified that Kelvin still directed sales and no one else contacted the Organization's suppliers because that was Kelvin's role. More drugs were available after Kelvin got out, and Anthony was able to resume selling. It was Kelvin who decreed that they would no longer supply drugs to Richardson, Sumpter, and others from the Hill as part of their retaliation for the violence that had occurred. Kelvin deemed Richardson the "heart" of the Hill Crew and said in the spring of 1999 that he needed to be "dealt with sooner or later." He also told Buchanan after Buchanan shot Richardson, "It's about time you did something."

The house on Lincoln Avenue served as the headquarters for the Organization; it was used as a meeting place, a storage facility for guns, a drug preparation area, and planning location. Kelvin lived there between 1997 and 2000, as did other members of the Organization. The jury could easily infer from the evidence of the activities that took place at the Lincoln Avenue house and the people involved that the acts of violence were part and parcel of the culture of the Organization, just as participation in the drug business was. Personal beefs also may have been satisfied, but the evidence supported a finding that the defendants engaged in violent acts because it was expected of them as a way of taking care of each other and as members of the Organization. There was sufficient evidence to support the

jury's finding that the government established the VCAR purpose element for Counts three and five through ten.

## III.

Kelvin and DMX Burden raise a challenge to comments the government made in the rebuttal portion of its closing argument. The government was discussing the existence of an enterprise and quoted from a jury instruction defining an enterprise as "[a] group of people characterized by a common purpose or purposes, an ongoing formal or informal organization or structure, and a core personnel to have a function as a continuing unit during the substantial time period."  The government lawyer said:

> A group of people.  Was this a group of people? Absolutely.  Did they form and operate in a continuing manner?  Absolutely.  Was there a core personnel? Absolutely. . . .
>
> An example I was trying to think of overnight to analogize what the argument is here.  Let's say, what's being said here is equivalent to, in an international context, a nation, or not a nation, a group who doesn't have defined boundaries, doesn't raise a flag, doesn't wear a common uniform, maybe even doesn't speak the same language.  Suppose that group does things, hijacks a plane from London, they blow up a tank in Afghanistan.  They do something, they do things all over the world.  And someone goes to the United Nations and says, "We need to hold them responsible.  We need to sanction them.  We need to react to that development."

Defense counsel objected and the district court directed the government lawyer to move on.  The defendants later moved for a mistrial, which the district court denied.

28

DMX Burden now argues that the government's remarks were an improper comparison between al-Qaeda and the trial defendants. Kelvin argues that the government incited racial and ethnic biases with its reference to the war on terrorism and airplane hijacking and by essentially comparing the defendants to terrorists. Both argue that the remarks deprived them of a fair trial and that this court should reverse their convictions and order a new trial.

We will not reverse a criminal conviction arising from an otherwise fair trial solely on the basis of inappropriate prosecutorial comments. Rather, we will reverse only if we conclude, based on the context of the trial as a whole, that the prosecutor made improper remarks that resulted in substantial prejudice. United States v. Thomas, 377 F.3d 232, 244 (2d Cir. 2004). We look at three factors when considering whether an improper comment caused the defendants prejudice: 1) the severity of the misconduct; 2) the measures the district court adopted to cure the misconduct; and 3) the certainty of conviction absent the improper statements. United States v. Melendez, 57 F.3d 238, 241 (2d Cir. 1995).

The evidence at trial was sufficient for the jury to find that the Burden Organization was an organized group that had a shared purpose of selling narcotics. Its membership was clear, and it existed for several years. There was nothing complicated

29

about the government's ability to prove those facts.  It is thus unclear why the prosecutor felt it necessary to use an analogy of a far more elaborate international set-up with corresponding intrigue.  The district court's impression was that it was such a poor analogy that it might well have backfired on the government because the jury would react to it on its own as overreaching. It was improper in that it was a blatant ploy to evoke images of middle-Eastern terrorists seventeen months after the tragedy of September 11, but we conclude that it caused no prejudice.  The inept remarks were limited to the paragraph quoted above.  The defense objection was prompt and the prosecutor abandoned the analogy upon being directed by the district court to move on. The district court instructed the jury that the closing arguments were not evidence, and we have no difficulty in concluding that the jury would have reached its guilty verdicts if the remarks had never been made.  The district court did not err in refusing to grant a mistrial and the defendants' due process rights were not violated.

IV.

DMX Burden challenges the sufficiency of the evidence that he possessed a firearm during a drug trafficking crime.  Count Seventeen charged him with the use of a nine-millimeter Beretta handgun in connection with conspiracy to possess with intent to

distribute and to distribute cocaine base. He argues that the testimony of one police officer who found the gun near the place where DMX and another man were fighting was insufficient to support his conviction because there was no direct evidence linking him to the gun. He does not assert an alternative argument to the effect that, should we rule that sufficient evidence exists that he possessed the gun, the government failed to prove that it was in furtherance of a drug trafficking crime.

When viewed in the light most favorable to the government, the evidence was sufficient for the jury to find that DMX possessed the gun. He does not dispute that he was fighting and that police found the gun next to a fence approximately fifteen to twenty feet away from him. Anthony Burden testified that DMX called him that night and told Anthony he had pulled a gun on a man that day to whom DMX had fronted drugs and from whom he was trying to collect payment. He told Anthony that one of the man's friends called the police. When the police arrived they chased DMX, he threw the gun, and they found it and arrested him. While he was on the stand, Anthony identified the gun as belonging to DMX and said he had seen it at the Lincoln Avenue house. Anthony also identified Kelvin's voice on a tape recording in which he was talking to DMX about a "card" that DMX had lost in an altercation, and Anthony testified that "card" referred to DMX's gun.

31

We affirm DMX's conviction on Count Seventeen.[6]

V.

Kelvin Burden raises several additional issues.

A.

First, he argues that the district court erred in admitting into evidence a recording taken from a wire worn by government cooperating witness Darryl Saunders. The recording was of a controlled drug purchase by Saunders from Kelvin and DMX, which the government relied on as evidence to support the narcotics conspiracy charges in Counts Twelve and Fourteen. Saunders did not testify at trial; the recording was introduced through a law enforcement officer, Marc Lepore. Kelvin asserts that the recording was an inadmissible testimonial statement. Because Kelvin Burden did not object to the tape's admission at trial, we would normally review the challenge for plain error. See Fed. R. Crim. P. 52(b). In this case, however, we conclude that there was no error, plain or otherwise.

_____

[6]DMX Burden included in his brief a challenge to the constitutionality of the Sentencing Guidelines. His argument is moot. After the notices of appeal were filed in this case, the government moved for a limited remand as to QB Burden, Buchanan, and DMX Burden for the purpose of reconsidering their sentences pursuant to United States v. Crosby, 397 F.3d 103 (2d Cir. 2005). The district court declined to hold a resentencing for the other two, but did so for DMX and resentenced him to 264 months in prison. His original sentence was 352 months.

32

Under the Court's ruling in <u>Crawford v. Washington</u>, 541 U.S. 36, 61-62 (2004), an out-of-court statement made by a declarant who does not testify at trial, where the statement is deemed "testimonial," is not admissible unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant concerning the statement.  Thus, the first question is whether the statements were testimonial.

It is important to keep in mind that the declarant to whom Kelvin is objecting is Darryl Saunders.  Kelvin contends that Saunders's statements on the tape were testimonial because Saunders, who had consented to be wired, was aware that anything he said could be used against others at a future criminal trial.  In <u>United States v. Saget</u>, 377 F.3d 223, 228 (2d Cir. 2004), we wrote that "<u>Crawford</u> at least suggests that the determinative factor in determining whether a declarant bears testimony is the declarant's awareness or expectation that his or her statements may later be used at a trial."  However, we later made clear that this broadly worded test in <u>Saget</u> was dictum.  <u>See United States v. Feliz</u>, 467 F.3d 227, 235 (2d Cir. 2006)("We do not believe, however, that this statement in <u>Saget</u> should be read to have adopted such an expansive definition of testimonial.").  In <u>Feliz</u>, we held that autopsy reports were not testimonial, and in the course of doing so we stated:

> Certainly, practical norms may lead a medical examiner
> reasonably to expect autopsy reports may be available for

> use at trial, but this practical expectation alone cannot be dispositive on the issue of whether those reports are testimonial. . . . Given that the Supreme Court did not opt for an expansive definition that depended on a defendant's expectations, we are hesitant to do so here.

Id. at 235-36.

In a recording on a body wire by a confidential informant, there are two types of statements: those made by the informant, who is well aware that what he is saying may be used at a later trial, and those by other participants in the conversation, who are not. Undeniably, Crawford makes a declarant's awareness of his statement's possible future use at trial part of the equation in gauging whether the statement is testimonial, see 541 U.S. at 52, but even if this were the sole touchstone – and after Feliz, it is the law of this circuit that it is not the sole touchstone – there is still no Confrontation Clause problem with respect to the statements on the recording by anyone other than Saunders himself, as he was the sole declarant aware that any recording was being made. With respect to those others, it is difficult to imagine how a Crawford violation could arise, for, as to them, Saunders was simply a tool for bringing the recording device within range of the conversation to create an audio picture of the event.

But Kelvin objects to utterances by Saunders himself. In particular, he objects to an exchange in which Saunders asks "[W]hat are you charging for a 14?," David Burden replies "550,"

34

and Saunders whistles, communicating his impression that this is a high price.  Assuming for present purposes that this constitutes a "statement," does Saunders's awareness that the statement is being recorded for a future criminal trial make the statement testimonial?  We hold that the answer is no.

In Crawford, the Supreme Court observed that "[t]he constitutional text [of the Confrontation Clause], like the history underlying the common-law right of confrontation, . . . reflects an especially acute concern with a specific type of out-of-court statement."  541 U.S. at 51.  The Court elaborated:

> Various formulations of this core class of "testimonial" statements exist: " *ex parte* in-court testimony or its functional equivalent-that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," . . .; "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," *White v. Illinois,* 502 U.S. 346, 365 (1992) (THOMAS, J., joined by SCALIA, J., concurring in part and concurring in judgment); "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," . . . .  These formulations all share a common nucleus and then define the Clause's coverage at various levels of abstraction around it. Regardless of the precise articulation, some statements qualify under any definition – for example, *ex parte* testimony at a preliminary hearing.

Id. at 51-52.  As the reasoning of Feliz suggests, it is unwise to read Crawford's catalog of the "core class of testimonial statements" as more than a set of guideposts as courts work

35

through, case-by-case, different kinds of statements and determine whether they are testimonial. This part of Crawford cannot be a holding, as no court can say whether a particular kind of statement is testimonial until it has considered that kind of statement in an actual case. It is important to remember, too, that the Crawford Court was merely listing "[v]arious formulations" of the core class, without expressing a preference among them. Id. The statements of a confidential informant on a wire he is wearing fall under none of those formulations other than "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Saunders's statements are not remotely equivalent to in-court testimony or its equivalent, and are even further from being formalized testimonial material.

But even to the extent that Saunders knew his statements could be used at a future trial, this is not a case in which anything Saunders said was spoken for the purpose of accusing. Rather, his comments were made to elicit inculpating statements by others present. And the Supreme Court has already found instances in which there was no Crawford violation even though the declarant surely knew her statements could be used at a future trial. In the lead case discussed in Davis v. Washington, 547 U.S. 813, 817-18 (2006), the declarant, a domestic-abuse

36

victim, called 911 and told the operator that the defendant, whom she named, had, in the moments immediately preceding the call, been hitting her with his fists.  Surely one who calls 911 is aware that her call may be recorded, and could be used as evidence.  And yet the Supreme Court found a dispositive distinction from Crawford: the purpose of the declarant's statement had not been to testify but "to enable police assistance to meet an ongoing emergency," and the statement was therefore not testimonial.  Id. at 828.

It might be tempting to limit the applicability of Davis in light of the exigency of the circumstances there, and the lack of an emergency when a confidential informant speaks to a drug dealer.  But this would miss the broader significance of Davis: the declarant's purpose in speaking matters.  Saunders was not phoning in an ongoing emergency, but he also was not testifying, either; he was attempting to elicit statements from others, and anything he said was meant not as an accusation in its own right but as bait.  Saunders is thus similar to the declarant in the lead case in Davis, because his purpose was non-accusatory.  On the same basis, he is distinguishable from the declarant in Crawford, who made a tape-recorded statement to police after the crime was over, see 541 U.S. at 39, and from the declarant in the companion case in Davis, who gave a handwritten statement shortly after the domestic abuse incident once the danger had passed

37

(which statement the Supreme Court found testimonial), see 547 U.S. at 819-20, 822.  On this basis, we conclude that Saunders's statements on the body wire recording are not within the "core class of testimonial statements" described in Crawford, even when one accounts for Saunders's knowledge that his statements could be used at a later trial.[7]

Because Saunders's statements were not testimonial, Kelvin Burden had no Sixth Amendment right to confront him, and there was no error.

B.

Next, Kelvin submits that this Court should reverse his conviction on Counts Twelve (narcotics conspiracy) and Fourteen (narcotics possession with intent to distribute) if we reverse his RICO and VCAR convictions because spillover evidence admitted

[7] In a letter submitted pursuant to Federal Rule of Appellate Procedure 28(j), Kelvin calls our attention to the Supreme Court's decision last year in Melendez-Diaz v. Massachusetts, 129 S.Ct. 2527 (2009), in which the Court found affidavits to be testimonial where those affidavits, prepared by laboratory scientists, showed that material seized was cocaine.  Affidavits, however, are quintessential traditional testimonial materials that fit comfortably within the "core class" described by Crawford.  See id. at 2533 (referring to the Court's holding as a "rather straightforward application of ... Crawford.").  As our discussion makes clear, we hold that a confidential informant's statements on a body wire he is wearing do not fit in this class.  Furthermore, one Justice whose vote was necessary for the five-member majority in Melendez-Diaz expressly stated that he joined the Court's opinion only because "the documents at issue ... are quite plainly affidavits ... [and] [a]s such, they fall within the core class of testimonial statements governed by the Confrontation Clause."  Id. at 2543 (Thomas, J., concurring) (internal quotation marks omitted).

as to those counts was prejudicial to him.  We are affirming his conviction on the latter counts and thus his argument as to the former is moot.

## C.

Kelvin argues that a number of trial errors occurred with a cumulative effect of depriving him of his due process right to a fair trial.  His assertions are broad.  He submits that the district court repeatedly limited his cross-examination of pivotal prosecution witnesses throughout the trial and refused to tell the jurors that it had found Anthony Burden's testimony incredible.  He includes as error the district court's refusal to grant a mistrial as a result of the prosecutor's remarks in its closing argument, which we have already rejected.  Finally, he argues that the district court jeopardized the integrity of the jury by allowing alternate jurors to eat lunch with deliberating jurors.  His argument is devoid of record or case law citations, and we find it to be without merit.

We are not aware of any instances in which the district court limited Kelvin's cross-examination, and he does not identify any witnesses with whom that happened.  We will not assign as error a district court's refusal to remark on a witness's credibility.  District courts are to leave it to jurors to decide the credibility of witnesses.  "It is only where

39

exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992). Kelvin has set forth no alleged exceptional circumstances. With respect to the jurors dining together, the district court instructed the deliberating jurors not to deliberate at any time that they were outside of the jury room, and particularly not with alternate jurors. The district court invited objection but heard none. No error occurred.

## D.

Kelvin raises two additional trial issues. First, he asserts that his forfeited Mercedes should be returned to him because the evidence showed that it was just as likely that the purchase money came from insurance proceeds from Sean's death as from criminal activity. He provides no record cites, however. As the government points out, the district court bifurcated the argument, instructions, and deliberations of the forfeiture issue. The government had the burden to prove the facts supporting forfeiture by a preponderance of the evidence. United States v. Fruchter, 411 F.3d 377, 383 (2d Cir. 2005).

Several witnesses testified concerning Kelvin's purchase of the Mercedes. He identified himself as "Mike" when he bought the car for $46,000 by making periodic cash payments to the dealer in

40

the thousands of dollars. When he made the last payment, he told the dealer to change the name on the bill of sale to Kelvin's father's name and to list a false purchase price of $9,000. Anthony Burden testified that Kelvin purchased his Mercedes with money he obtained from selling drugs. Because it is not our province to choose among competing permissible inferences, but rather it is the jurors' role to do so, United States v. Johns, 324 F.3d 94, 96-97 (2d Cir. 2003), we will not reverse the forfeiture.

The last trial issue concerns Kelvin's allegation that his trial counsel had an actual, undisclosed conflict of interest, thereby necessitating a new trial. He asserts that his lawyer had previously represented co-defendant Demetrius Story in an earlier state court case, and that as a result his attorney declined to call Story as a witness in spite of Kelvin's request that he do so. Kelvin submits that he told his counsel that Story would have testified that Kelvin did not continue selling narcotics while incarcerated, but counsel did not investigate the claim.

This is the first instance in which Kelvin has raised the issue of his counsel's alleged conflict of interest. He acknowledges that the facts supporting these allegations are outside the record. In such an instance, where the "record on appeal does not include the facts necessary to adjudicate a claim

41

of ineffective assistance of counsel, our usual practice is not to consider the claim on the direct appeal, but to leave it to the defendant to raise the claims on a petition for habeas corpus under 28 U.S.C. § 2255." United States v. Oladimeji, 463 F.3d 152, 154 (2d Cir. 2006) (explaining that collateral review provides better evaluation of ineffectiveness claim because record can be developed in district court). Kelvin provides no compelling reason why we should vary from our usual practice, and we decline to consider his claim as a part of this direct appeal.

E.

Kelvin raises three sentencing issues. He asserts that two prior narcotics convictions should have been considered relevant conduct to the narcotics conspiracy of which he was convicted in this case and thus not listed as separate offenses when calculating his criminal history category. The Sentencing Guidelines provide that criminal history points are to be allocated for prior sentences, defined as sentences previously imposed for conduct that is not part of the instant offense. U.S.S.G. § 4A1.2(a)(1). Conduct that is part of the instant offense is further defined as that which is "relevant conduct to the instant offense under the provisions of § 1B1.3." Id. section 4A1.2, cmt. n.1. Section 1B1.3, in turn, provides that relevant conduct includes acts that were "part of the same course

42

of conduct or common scheme or plan as the offense of conviction." See United States v. Thomas, 54 F.3d 73, 83 (2d Cir. 1995).

Kelvin did not object to this calculation at the time of his sentencing, and thus we review for plain error. He provides no information concerning his prior convictions which would allow us to determine whether they were part of the same course of conduct or common scheme or plan. The record indicates that one was a 1992 conviction and the other a 1996 conviction. (GA 1895-96) The conspiracy in this case was alleged to begin in 1997. (GA 40-41) Based on the information as we know it, this argument does not indicate that resentencing is necessary.

Second, he demands to be resentenced because the transcript suggests that the district court relied upon the docket sheet to confirm that the government had filed and served a prior felony information sheet. According to Kelvin, the district court should have but did not verify the document existed. Again, he did not raise this issue before the district court. Kelvin provides no authority that the district court erred, that the document was not filed, or that his counsel was not served with a copy. He indicates no prejudice. The argument is without merit.

Finally, Kelvin asserts that he should not have received a four-level enhancement pursuant to Sentencing Guidelines § 3B1.1 for his role as a leader because it was based upon judicially

43

found facts in violation of his Sixth Amendment rights.  Case law does not support him.  "Judicial authority to find facts relevant to sentencing by a preponderance of the evidence survives Booker. . . . [T]he sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence. . . ."  United States v. Garcia, 413 F.3d 201, 220 n.15 (2d Cir. 2005).  Thus, the district court was entitled to make the factual determination relating to the enhancement.  Moreover, even if we were to find error, the argument would be moot.  Kelvin is subject to two mandatory life sentences under Counts Eight (VCAR murder of Owens) and Twelve (narcotics conspiracy coupled with prior convictions).  He thus could not receive a lesser sentence even if he were to be resentenced.


VI.

QB Burden raises one additional argument, that the RICO statutes are unconstitutionally vague as applied to him because he could not have known that his personal beefs and corresponding violence against members of the Hill Crew would combine with his status as a "mere seller" of narcotics and result in RICO liability.  He acknowledges that case law holds otherwise, but asks that we consider his claim.  He preserved his challenge by raising it in the district court.

44

A statute is unconstitutionally vague if it "either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." Connally v. Gen. Constr. Co., 269 U.S. 385, 391 (1926). We are to evaluate constitutional vagueness challenges on the facts of the given case and not on a speculative application of the statute. United States v. Coonan, 938 F.2d 1553, 1562 (2d Cir. 1991). We are of course bound by the law of this circuit, which has consistently rejected such challenges to the RICO statute. E.g., id.; United States v. Coiro, 922 F.2d 1008, 1017 (2d Cir. 1991); United States v. Ruggiero, 726 F.2d 913, 923 (2d Cir. 1984) (abrogated on other grounds by Salinas v. United States, 522 U.S. 52, 61, 63 (1997)); United States v. Huber, 603 F.2d 387, 393 (2d Cir. 1979).

QB's constitutional challenge fails. The record supports a finding that he was deeply involved in the narcotics conspiracy and a key figure in planning and carrying out acts of violence against members of the Hill Crew as part of an organized response by the Burden Organization. On the facts of this case, he had sufficient notice that his conduct subjected him to the penalties associated with the RICO statute.

45

VII.

Jermain Buchanan sets forth three separate arguments. First, he submits that the district court erred by not dismissing racketeering Acts 3A, 3B, and 4 on double jeopardy grounds. Buchanan was tried and acquitted in state court in connection with Derek Owens's death and Marque Young's shooting, and he argues that being subjected to federal prosecution for the same conduct violates the Double Jeopardy Clause of the Fifth Amendment.

Buchanan and Angel Cabrera were tried by a Connecticut state court jury in January 2001 on charges of attempted murder, first degree assault, and conspiracy to commit murder arising out of the death of Owens and the shooting of Young. They were acquitted on all counts. Eleven months later, a third superceding indictment was handed up in this case that added Buchanan as a defendant. He was charged in several counts, including Count One (RICO) and specifically with racketeering Acts 3A (conspiracy to murder Marque Young), 3B (attempted murder of Young), and 4 (murder of Derek Owens). Buchanan filed a motion to dismiss, which the district court denied. Under the dual sovereignty principle, a defendant may be prosecuted for the same conduct by more than one sovereign without offending the Double Jeopardy Clause because breaking the laws of each constitutes separate offenses. Heath v. Alabama, 474 U.S. 82, 88

46

(1985).  State and federal governments are separate sovereigns in this analysis.  Id. at 89.

Although Buchanan included his challenge to the dual sovereignty exception to the Double Jeopardy Clause in his appeal, he acknowledges that this Court is not free to make new law on the issue.  See United States v. Nelson, 277 F.3d 164, 212 n.58 (2d Cir. 2002).  We thus reject his argument because it is foreclosed by prevailing authority.  See United States v. Coonan, 938 F.2d 1553, 1563 (2d Cir. 1991) (acquittal in state court of murder does not preclude federal authorities from charging same offense as predicate act in RICO prosecution).  The same holds true for Buchanan's subsidiary argument that cooperation between Connecticut and federal authorities may afford him double jeopardy relief under the exception that has arisen from Bartkus v. Illinois, 359 U.S. 121, 123-24 (1959).  This circuit has defined this exception by saying that "the Double Jeopardy Clause may be violated despite single prosecutions by separate sovereigns when one prosecuting sovereign can be said to be acting as a tool of the other."  United States v. All Assets of G.P.S. Auto. Corp., 66 F.3d 483, 494 (2d Cir. 1995) (internal quotation marks omitted).  We have explained, however, that "[t]his exception is not triggered simply by cooperation between the two authorities," but that "[one] government must have effectively manipulated the actions of the [other] government, so

47

that [the other government's] officials retained little or no independent volition." United States v. 38 Whalers Cove Drive, 954 F.2d 29, 38 (2d Cir. 1992). Buchanan concedes this point of law and points to no evidence that manipulations has occurred here.

Buchanan's second argument is that the district court erred in allowing Marque Young's written statement to be admitted into evidence. We review for abuse of discretion. United States v. Forrester, 60 F.3d 52, 59 (2d Cir. 1995). Young testified at trial and described having seen Buchanan and another person as the shooters. He further testified that he had identified Buchanan in two separate photo spreads. During cross-examination, Buchanan's counsel attempted to introduce an October 1999 statement in which Young told police that he wasn't sure Buchanan was in the front passenger seat. The government objected and the district court sustained the objection. The government later stated that it would withdraw its objection if it could introduce a November 1999 statement in which Young identified Buchanan as the shooter under the theory that it was a prior consistent statement. The district court ultimately allowed both the October and November statements to be admitted.

Buchanan argues that the November statement was not admissible under Federal Rule of Evidence 801(d)(1)(B) as a prior consistent statement because he had never made a charge of recent

fabrication against Young. Instead, he argues that his goal in getting the October statement admitted was to impeach Young and make his trial testimony less believable because of his earlier inconsistent statements. Buchanan further argues that the government's purpose in introducing the November statement was improper bolstering of Young's credibility. We conclude that the district court did not abuse its discretion in allowing the second Young statement to be introduced in conjunction with the first. Buchanan was attempting to impeach Young, specifically by suggesting that his trial testimony in which he identified Buchanan as a shooter was a recent fabrication. Once allowed to raise that inference, the district court was well within its discretion to allow a month-later statement, consistent with the trial testimony, to be introduced to rebut the charge that Young's trial testimony was recently fabricated.

Buchanan's final argument is that there was insufficient evidence to support the district court's findings that Buchanan was responsible for more than 150 grams of cocaine base (crack) and that he was one of the core members of the conspiracy and thus responsible for the drugs distributed by the Burden Organization. The government has set forth a number of witnesses who testified as to the enormous quantities of cocaine and crack the Burden Organization conspired to sell and sold. They sold daily, purchased in kilogram quantities, and sometimes sold as

much as a kilogram in a week.  In addition, there was much evidence of Buchanan's participation as a seller, cooker, and bagger.  Prezzie testified that Buchanan personally dealt seven to fourteen grams of crack on a weekly basis for a year or two. We conclude that the district court committed no clear error in its factual findings at Buchanan's sentencing.

VIII.

Terrence Boyd raises a single issue on appeal.  He pleaded guilty to one count of possessing with intent to distribute and distributing five grams or more of a mixture or substance containing a detectable amount of cocaine.  He entered into a stipulation at sentencing that he was a career offender pursuant to U.S.S.G. § 4B1.1 with a base offense level of 34, and that if he received a three-level reduction for acceptance of responsibility his guideline range would be 188 to 235 months' imprisonment.  He reserved the right to, and did, argue for a downward departure, but the district court declined to exercise its discretion.  The district court sentenced Boyd to 188 months' imprisonment and five years of supervised release.  Following his notice of appeal, this Court remanded this case pursuant to United States v. Crosby, 397 F.3d 103 (2d Cir. 2005).  The district court solicited briefing by the parties on whether it would have imposed a non-trivially different sentence if the

50

Sentencing Guidelines had been advisory, and later concluded that resentencing was unnecessary because it would have imposed the same sentence had the Guidelines been advisory.

Boyd now argues that his sentence would have been different absent the mandatory Guidelines. He asserts that his counsel would have made different departure arguments, would have argued that the career offender guideline was unnecessarily high due to the disparity in treatment between crack and powder cocaine, and that the district court would have been more receptive to arguments based on the over-representation of Boyd's criminal history.

We review Buchanan's sentence for reasonableness, even after a district court declines to resentence following a Crosby remand. United States v. Williams, 475 F.3d 468, 474 (2d Cir. 2007), cert. denied, 128 S. Ct. 1495 (2008). We conclude that the sentence, which was at the bottom of the range Buchanan stipulated to, was reasonable. See Rita v. United States, 127 S. Ct. 2456, 2462-65 (2007).

However, we will remand Boyd's sentence pursuant to Kimbrough v. United States, 128 S. Ct. 558 (2007), as set forth below.

IX.

All of the five defendants in this case were convicted of

51

and sentenced for offenses involving crack cocaine. The parties submitted their briefs prior to the Supreme Court's decision in Kimbrough v. United States, 128 S. Ct. 558 (2007), in which the Court held that a sentencing judge may consider the disparity between the Guidelines' treatment of crack and powder cocaine offenses. Id. at 575. None of these defendants raised the issue before the district court. Accordingly, we must remand "to give the district court an opportunity to indicate whether it would have imposed a non-Guidelines sentence knowing that it had discretion to deviate from the Guidelines to serve [the] objectives [of sentencing under 18 U.S.C. § 3553(a)]." United States v. Regalado, 518 F.3d 143, 149 (2d Cir. 2008) (per curiam).


Conclusion

We affirm the convictions of David L. Burden, Kelvin Burden, Jermain Buchanan, and David M. Burden. We affirm the sentences of Kelvin Burden, Jermain Buchanan, and Terrence Boyd. We remand each defendant's sentence pursuant to Regalado.