[784 NYS2d 489]

# The People of the State of New York, Respondent, v Alvin Collins, Appellant.

First Department, October 21, 2004

APPEARANCES OF COUNSEL

*Andrew C. Fine, The Legal Aid Society*, Brooklyn (*William B. Carney* of counsel), for appellant.

*Robert M. Morgenthau, District Attorney*, New York City (*Beth Beller* and *Susan Gliner* of counsel), for respondent.

## OPINION OF THE COURT

ELLERIN, J.

We hold that the catalogue of prosecutorial improprieties committed during summation to the jury in this case deprived defendant of his right to a fair trial.

Defendant was convicted of selling cocaine to an undercover police officer. The uncontested evidence at trial showed that on the night of August 12, 2001, defendant led the undercover to a location on West 146th Street where a man wearing a ski mask handed over two tinfoil packets containing crack cocaine in exchange for $40. The People sought to prove that defendant was acting to sell drugs for his own benefit. Defendant testified that he was acting solely as an agent for the undercover buyer.

The undercover testified that after he gave the money to defendant, defendant questioned him about his drug use, and when he told defendant that he smoked marijuana laced with crack, defendant insisted on accompanying him to buy marijuana. At the corner of 150th Street, the undercover told defendant to wait outside while he went into a building. When he came out of the building, he told defendant, in response to defendant's inquiry, that he had tried to buy cocaine. Defendant replied that if the undercover had said he was trying to buy marijuana at that location, he would have known the undercover was lying and would have "deaded it" or ended the whole transaction. Defendant then took the undercover to the location on 146th Street, handed the money to the masked man and took the cocaine. However, he would not give the cocaine to the undercover until they had crossed the street.

Defendant testified that he took the undercover to the 146th Street spot, told the masked man that his "friend" wanted "two," and the undercover and the masked man exchanged the

money and the cocaine directly between them. Defendant testified that he did not help anyone sell drugs. He said, "The only thing I did that night was help an undercover officer purchase the drugs he asked me to help him purchase."

The "ghost" officer who participated in the buy-and-bust operation testified that he observed defendant and the undercover talking, but he could not hear their conversation, did not observe any other interaction between them, and was unable to see if there was a transaction at 146th Street or any exchange between the two after they crossed the street.

The People also presented evidence that, six months earlier, on the night of February 8, 2001, two undercover officers were approached at 146th Street and Broadway by defendant, who asked if they were looking for drugs. One of the undercovers answered that he wanted "two dimes of crack," and defendant replied, "All right, give me twenty bucks." Defendant walked over to a cellar area, where he bent down and picked up something. Returning to the undercover, he said that before turning over the crack, he wanted to see the undercover smoke it. The undercover agreed and said they could go to his car to smoke. Defendant got in the car, handed the undercover one tin and told him to smoke it. The undercover transmitted a positive buy signal to the backup team.

Defendant testified that on February 8th, he was approached by two men who looked upset. He asked if they were all right and they told him they had given money for drugs to someone who had run off with it. Defendant agreed to help the men buy drugs if he could hang out and smoke with them. He bought the drugs from a man selling in a basement, got in their car and realized he was surrounded by police.

Following his conviction and before sentencing, defendant moved, pursuant to CPL 330.30 (1), to set aside the verdict. He argued, inter alia, that in her summation the prosecutor made numerous improper comments, the cumulative effect of which was so prejudicial as to deny him a fair trial. The trial court found that "from beginning to end, the prosecutor's summation contained a large number of improper remarks," but that in all but a few instances, defendant either did not object or requested no further relief when his objections were sustained. The court concluded that in the absence of preservation it had no jurisdiction under CPL 330.30 (1) to determine whether defendant's right to a fair trial was violated by the prosecutor's improper remarks during summation.

Defendant's claims are largely unpreserved for appellate review since he failed to object to the majority of the comments, failed to seek further curative instructions after certain objections were sustained and failed to move for a mistrial on this ground after the court overruled some of his objections (*People v Balls*, 69 NY2d 641 [1986]; *People v Medina*, 53 NY2d 951 [1981]). The prosecutor's summation, however, contained a substantial number of improper remarks which cannot be considered fair responses to the defense summation or isolated instances of misconduct. While any particular instance, standing alone, would not necessarily justify reversal, the cumulative effect of the remarks served to deprive defendant of a fair trial (*People v Calabria*, 94 NY2d 519 [2000]). The judgment of conviction must be vacated and the matter remanded for a new trial.

A public prosecutor stands at a "pivotal point" in the criminal justice system (*People v Zimmer*, 51 NY2d 390, 393 [1980]). "Unlike other participants in the traditional common-law adversarial process, whose more singular function is to protect and advance the rights of one side, a District Attorney carries an additional and more sensitive burden. It is not enough for him to be intent on the prosecution of his case. Granted that his paramount obligation is to the public, he must never lose sight of the fact that a defendant, as an integral member of the body politic, is entitled to a full measure of fairness. Put another way, his mission is not so much to convict as it is to achieve a just result" (*id.*).

The public prosecutor is a "quasi-judicial officer, representing the People of the state, and presumed to act impartially in the interest only of justice. If he lays aside the impartiality that should characterize his official action to become a heated partisan, and by vituperation of the prisoner and appeals to prejudice seeks to procure a conviction at all hazards, he ceases to properly represent the public interest, which demands no victim, and asks no conviction through the aid of passion, sympathy or resentment" (*People v Fielding*, 158 NY 542, 547 [1899]). Thus, as a practical matter, "although counsel is to be afforded the widest latitude by way of comment, denunciation or appeal in advocating his cause[,] summation is not an unbridled debate in which the restraints imposed at trial are cast aside so that counsel may employ all the rhetorical devices at his command. There are certain well-defined limits" (*People v Ashwal*, 39 NY2d 105, 109 [1976] [internal quotation marks and citation omitted]).

A prosecutor exceeds the bounds of legitimate advocacy by resorting to name calling, such as characterizing the defendant as a liar (*People v Shanis*, 36 NY2d 697, 699 [1975]; *People v Dowdell*, 88 AD2d 239, 247 [1982] ["in the interests of presenting a balanced view of this evidence, prosecuting attorneys should steadfastly avoid this tactic"]). Here, the prosecutor repeatedly referred to defendant as a liar. She began by characterizing his story as "unbelievable," adding that "[t]he only testimony that we have to prove that is his own, Alvin Collins' testimony, that's it." Throughout her summation, the prosecutor referred to defendant's testimony, by turns, as "unbelievable," "ridiculous," "absurd" and "fantastical." She stated not only that defendant "made up" that "unbelievable" story but also that "he knows that that's the defense he has to put forth, . . . [s]o, of course, that's what he's going to assert to you." She told the jury that defendant's "motive to lie is gigantic. And we know that he is a liar. . . . He's lied before." She said that "to credit the defendant would be wrong to do."

Equally, a prosecutor may not vouch for the credibility of the People's witnesses (*People v Bailey*, 58 NY2d 272, 277 [1983] ["the weight of the prestige of the office and its image of disinterestedness may impose upon a defendant's right to an impartial trial"]). Here, the prosecutor repeatedly told the jury that it could not believe defendant's testimony that he was merely doing the undercover a favor by helping him buy drugs unless it believed that all the undercovers were lying, and urged:

> "Ask yourself why would they do that? You met the undercover officer, the primary in this case. . . . Remember how forthright he was, how long and hard he's worked to becoming an undercover, the fact that he started off in foot patrol. Remember how credible he was and ask yourself, is he going to take the stand and perjure himself, commit a crime for this case? If he's going to lie, why not make it rock solid? Why not plant drugs on him? Why not plant money? Why risk losing the case or potentially have action taken against him? Take that into consideration. Because what the defense counsel is asking you to do is tell the undercover he's lying."

And again, later:

> "If you are going to credit the undercover, think about how he appeared to you on the stand and

what his possible motives to lie would be. And if he was going to lie, why not make it rock solid and really frame this defendant? Why leave it open to any kind of possibilities? Because he's telling you the truth."

Moreover, instructing the jury that in order to find a defendant not guilty it must find that the prosecution witnesses lied is an impermissible attempt to shift the burden of proof from the People to the defendant (*People v Levy*, 202 AD2d 242, 245 [1994] [prosecutor erred by "implying that the jury was entitled to acquit only if it disbelieved the evidence actually presented. The jury was, of course, also obligated to acquit if it found the evidence, even if completely reliable, insufficient to establish each element of the crimes charged beyond a reasonable doubt"]).

Nor may a prosecutor attempt to shift the burden of proof by implying that the defendant has an obligation to introduce evidence (*see People v Ortiz*, 116 AD2d 531, 532 [1986]). Here, the prosecutor's twice-repeated remark that the only evidence in defendant's favor was his own testimony suggested that defendant was obligated to put on additional evidence. Moreover, her insinuation that the defense was tailored to fit what she labeled a "technical" defense that "clearly the defense counsel knows a lot about [as] does his client" impermissibly denigrated the defense theory of agency (*People v Torres*, 111 AD2d 885, 886 [1985] ["The prosecutor's consistent implication that defendant and his trial counsel had concocted the alibi, through the use of phrases such as 'doomsday sham', 'unbelievable defense', 'smokescreen' and ' (c)onfusion defense', clearly exceeded the bounds of proper rhetorical comment."]).

Absent unusual circumstances, a prosecutor may not use a defendant's pretrial silence to impeach his trial testimony (*see People v Conyers*, 52 NY2d 454, 460 [1981] ["Evidence that is highly prejudicial but of low probative worth has traditionally been excluded from criminal trials because it carries with it a grave potential for distorting the search for truth which is at the heart of our adversary system"]; *People v Carter*, 149 AD2d 83, 90 [1989] ["This minimal probative value is far outweighed by the chilling effect the use of a defendant's pretrial silence or invocation of his right to counsel has on the exercise of these fundamental liberties"]). Here, in pretrial proceedings, the court ruled that the prosecutor could inquire as to defendant's interview with CJA but that she must "be careful in regard to

implying that he had an obligation to say anything to CJA. He had no obligation to say anything. He had a right to remain silent in that regard." Despite the court's warning, the prosecutor told the jury that in his CJA interview, defendant "doesn't give simple information, your name, where you live, do you have a job. If you tell the truth about that, how can that hurt you? This is what I do, this is where I live, hey, I didn't do this."

The prosecutor disregarded another of the court's pretrial rulings when she used evidence of a previous alleged sale by defendant to argue propensity, after the court properly permitted the evidence for the limited purpose of arguing intent in order to rebut the agency defense (see *People v Molineux*, 168 NY 264 [1901]). The prosecutor argued propensity while vouching for the undercover. She said that to believe defendant, the jury must believe that the undercover "is lying from the last time he did the exact same thing in the exact same location, two tins for twenty dollars on the same street corner." She argued propensity while branding the defendant a liar:

> "The motive to lie, ladies and gentlemen, is not on the police, it is on Alvin Collins. And make no mistake about it, make no mistake about it, the only person he was out there to help was himself, not an undercover officer he never met before, not an undercover officer a few months earlier that he never met before. He's done the exact same thing before."

She argued propensity yet again while arguing intent: "If he did it before, does it show he had intent to do it this time? Ask yourselves that. Discuss it. And I submit to you it does. It certainly does, especially on the same corner."

Defense counsel objected to each of these remarks and the court sustained the objections. Nevertheless, the jury was repeatedly exposed to the propensity argument (see *Molineux, supra* at 313 ["it is much easier to believe in the guilt of an accused person when it is known or suspected that he has previously committed a similar crime"]; *People v Correal*, 160 AD2d 85, 94 [1990] ["the prosecutor's comments on summation served as an overt reminder to the jury to consider the testimony of the Rosado incident as exhibiting defendant's propensity to commit gun crimes"]).

A prosecutor may not refer to matters not in evidence or call upon the jury to draw conclusions that cannot fairly be inferred

from the evidence (*People v Ashwal, supra*, 39 NY2d at 109 ["It is fundamental that the jury must decide the issues on the evidence"]). Here, the prosecutor strayed outside "the four corners of the evidence" (*id.*) in arguing, without any evidentiary basis, that defendant was a drug seller and part of an organized narcotics enterprise.

> "Alvin Collins is a drug seller. Make no mistake about that. . . . "[O]n the night of August 12th, his job was to go out, get customers, screen them to make sure they were not cops, and bring them back to the location. Some other night maybe he was the guy at the front door with the ski mask. But that was his job on this night.
>
> "That's the safest way to do drug deals, not on the street but to go inside of a lobby, take over the lobby of the building where people live with children, who work, take over that lobby—
>
> "People live in that building, and those dealers have taken over that lobby."

And, later:

> "Ladies and gentlemen, don't let the defendant get away with being part of this organization."

And:

> "I'm going to ask you now, ladies and gentlemen, to do the one thing that I asked you at the beginning I was going to ask you to do. Hold him responsible for his actions. Hold him accountable for his decision to be a part of narcotics street sales."

A prosecutor "[a]bove all . . . should not seek to lead the jury away from the issues by drawing irrelevant and inflammatory conclusions which have a decided tendency to prejudice the jury against the defendant" (*People v Ashwal, supra* at 110). Here, as well as going beyond the evidence, the prosecutor "sought to have the jury expand its role from that of a fact finder in this case to that of a community defender and avenger" (*People v Miller*, 149 AD2d 439, 440 [1989]). As the court instructed the jury after sustaining the last of defense counsel's repeated objections to the above-cited portions of the prosecutor's summation, "Your obligation here is to determine whether or not, on August 12, 2001, Mr. Collins sold drugs, participated in the sale of drugs, that is, acted on behalf of the seller. Your job here is not to eradicate drug transactions in the city."

Analyzing the quantum and nature of the proof in this case, whether the prosecutor's remarks were provoked by defense counsel's summation and the extent to which the trial judge promptly acted to remove any prejudicial effect, we cannot conclude that the prosecutor's improper remarks in summation were harmless (*People v Wood*, 66 NY2d 374, 379-380 [1985]). The evidence that defendant was selling drugs for his own benefit was hardly overwhelming. Rather, the jury was called upon to decide whether it should accept his word or that of the undercover, since the ghost was unable to corroborate the undercover's testimony as to the head nods, the exchange of money and the purchase of the narcotics.

The prosecutor's improper remarks were not provoked by defense counsel (*see People v Marks*, 6 NY2d 67, 77 [1959] ["These remarks to the jury must be considered in their relationship to the summation by the attorney for the defendant which had just been finished"], *cert denied* 362 US 912 [1960]). Her argument that defendant is a liar was not responsive to defense counsel's summation, which did not accuse the People's witnesses of lying. Indeed, defense counsel argued that "[t]here are subtle differences between him and the undercover, but on the whole the basic story is the same. It's just the conclusions that they want you to draw are different." While defense counsel's argument that defendant was never linked to the man in the ski mask invited a response from the prosecutor, the prosecutor's argument that defendant was part of a crime organization was unsupported by any evidence and therefore exceeded the bounds of proper summation (*see People v Trinidad*, 59 NY2d 820, 821 [1983]).

The trial court's intercession was not sufficient to ameliorate the harm. Indeed, in denying defendant's motion to set aside the verdict on the ground that defendant's objections to the prosecutor's summation were largely unpreserved, the court concluded:

> "Upon reviewing the transcript of the prosecutor's summation, I regret not having provided the jury with additional, *sua sponte*, curative instructions to correct misconceptions created by the People's closing argument. I am concerned with the overall tenor of the summation, despite my own subsequent legal instructions to the jury. The errors in the prosecutor's summation were not isolated ones, but instead, were recurrent themes throughout the closing argument."

"Evenhanded justice and respect for the fundamentals of a fair trial mandate the presentation of legal evidence unimpaired by intemperate conduct aimed at sidetracking the jury from its ultimate responsibility—determining facts relevant to guilt or innocence" (*People v Calabria*, 94 NY2d 519, 523 [2000]). We cannot assume that, absent all the prosecutor's improprieties in summation, defendant's version of events would not have carried the day (*People v Bailey, supra* at 278).

We find defendant's arguments concerning the grand jury presentation, his motion to dismiss the grand jury indictment and his objections to the trial court's evidentiary rulings to be without merit.

Accordingly, the judgment, Supreme Court, New York County (Brenda Soloff, J., on CPL 190.50 motion; John Cataldo, J., at jury trial and sentence), rendered August 7, 2002, convicting defendant of criminal sale of a controlled substance in the third degree, and sentencing him, as a second felony offender, to a term of $5^1/_2$ to 11 years, should be reversed, as a matter of discretion in the interest of justice, the judgment vacated and the matter remanded for a new trial.

BUCKLEY, P.J., MAZZARELLI, SAXE and MARLOW, JJ., concur.

Judgment, Supreme Court, New York County, rendered August 7, 2002, reversed, as a matter of discretion in the interest of justice, the judgment vacated and the matter remanded for a new trial.