Jomo DELESLINE, Petitioner,

v.

James T. CONWAY, Superintendent of Attica Correctional Facility, Respondent.

No. 10 Civ. 0055(VM).

United States District Court, S.D. New York.

Dec. 13, 2010.

Richard M. Greenberg, Office of the Appellate Defender, New York, NY, for Petitioner.

### DECISION AND ORDER

VICTOR MARRERO, District Judge.

Petitioner Jomo Delesline ("Delesline"), currently incarcerated at Attica Correctional Facility in New York ("Attica"), brings this amended petition (the "Petition") for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 ("§ 2254") against James T. Conway, the superintendent of Attica ("Respondent"). Delesline was convicted in New York State Supreme Court, Bronx County (the "Trial Court"), of three counts of attempted murder in the second degree, in violation of New York Penal Law ("NYPL") § 110/125.25(1). The Trial Court sentenced Delesline to three concurrent terms of twenty-five years imprisonment and five years of post-release supervision.

In the Petition, Delesline asserts three federal constitutional claims as grounds for habeas relief. First, Delesline argues that post-arrest statements he made while in police custody were improperly admitted as evidence because they were involuntary and obtained without the warnings specified by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (*"Miranda"*). Second, Delesline argues that the testimony of a prosecution witness was inflammatory and prejudicial and thereby denied him the right to a fundamentally fair trial as guaranteed by the Due Process Clause of the Fourteenth Amendment ("the Due Process Clause"). Third, he argues that this testimony was composed partially of inadmissible hearsay, thus violating Delesline's rights under the Confrontation Clause of the Sixth Amendment ("Confrontation Clause"). For the reasons discussed below, the Court DENIES Delesline's Petition.

### I. BACKGROUND [1]

#### A. FACTS

Delesline's convictions arise out of the shooting of Daniel Gonzalez ("Gonzalez"), Luis Cartagena ("Cartagena"), and Tijuan-

---

1. The factual and procedural summary below is derived from the following documents: Brief of Appellant in *People v. Delesline,* 52 A.D.3d 302, 859 N.Y.S.2d 440 (1st Dep't 2008), dated October 2007; Brief of Respondent in *People v. Delesline,* 52 A.D.3d 302, 859 N.Y.S.2d 440 (1st Dep't 2008), dated April 2008; Reply Brief of Appellant in *People v. Delesline,* 52 A.D.3d 302, 859 N.Y.S.2d 440 (1st Dep't 2008), dated April 2008 ("App. Div. Reply Brief"); Respondent's Declaration in Opposition to Petition for a Writ of Habeas Corpus, dated April 20, 2010; Respondent's Memorandum of Law, dated April 20, 2010 ("Habeas Opp."); the Petition, dated July 14, 2010; Petitioner's Memorandum of Law, dated July 14, 2010; Respondent's Declaration in Opposition to Amended Petition for a Writ of Habeas Corpus, dated August 16, 2010; Respondent's Memorandum of Law, dated August 16, 2010. Except where specifically referenced, no further citation to these sources will be made.

na Mimms ("Mimms") on February 10, 2004. At approximately 11:30 p.m., near 610 Castle Hill Avenue in the Bronx, a group of four men approached Gonzalez, Cartagena, and Mimms. Without warning, one of the four men extended his arm and several gunshots were fired. Mimms was shot in both of her legs, Cartagena was shot in his heel, and Gonzalez was shot in the back, rendering him paralyzed. Although Delesline was not alleged to have fired any of the shots, he was charged with participating in the shooting.

The police officers who responded to the scene received several descriptions of the shooters and followed their reported direction of flight. Delesline matched the general description of the shooters and two police officers apprehended him in front of 2280 Randall Avenue, about 75 to 100 yards from the crime scene. The other participants were never arrested or identified. After handcuffing Delesline, the officers recovered an inoperable .32–caliber revolver from his pants pocket. A shopping bag containing a Tec–9 semiautomatic weapon and several hats and bandanas was also recovered from the area.

The police then brought Delesline back to the crime scene for two eyewitnesses to determine whether or not Delesline was the shooter. Neither of the eyewitnesses identified Delesline as the shooter in the so-called "showup procedure." Delesline was brought to the 43rd Precinct stationhouse and transported to Lincoln Hospital in the Bronx at approximately 2:45 a.m. for medical attention to several scratches and a dry cut on the back of his head. Detective Michael Tozzi ("Detective Tozzi") questioned Delesline at the hospital, without providing *Miranda* warnings beforehand, about his presence at the scene of the shootings. Delesline reportedly responded that he had been at the scene of the shooting to "buy weed" (the "Lincoln

Hospital Statements"). The police also seized Delesline's clothing to test for gunpowder residue, but none was found.

After receiving treatment, Delesline was brought back to the 43rd Precinct stationhouse at approximately 5:00 a.m. on February 11, 2004. By then, Detective Tozzi had obtained surveillance footage from 2280 Randall Avenue, but the footage was recorded in a format that could be decoded and displayed only with a particular surveillance system that was not available at the stationhouse. The decoder at 2280 Randall Avenue was broken, and Detective Tozzi had difficulty finding another location to display the footage. He instructed officers at the stationhouse not to transport Delesline to Central Booking for arrest processing until Detective Tozzi was available to do so. Detective Tozzi slept in the stationhouse from 6:30 a.m. until 9:30 a.m. and then attempted to find a location where he could view the footage. He ultimately was not able to view the footage until approximately 2:00 p.m. in Queens.

The footage showed Delesline waiving a gun inside an elevator at 2280 Randall Avenue shortly before the shooting. The footage also showed a group of four men walking towards the crime scene shortly before the shooting and running back to the building shortly thereafter. After viewing six tapes of footage, Detective Tozzi returned to the Bronx stationhouse at approximately 6:00 p.m. with still printouts of the footage.

At approximately 8:00 p.m., Detective Tozzi issued *Miranda* warnings to Delesline and questioned him for one hour. Delesline made several inculpatory statements regarding the shooting and signed a statement that Detective Tozzi wrote summarizing his interrogation (the "Stationhouse Statements"). At approximately 10:15 p.m., an assistant district attorney arrived at the stationhouse, provided *Mi-*

*randa* warnings to Delesline again and took a videotaped statement. Approximately twenty-four hours after his initial arrest, Delesline was transferred to Central Booking for arrest processing. While at the stationhouse, Delesline was dressed in a "paper suit" and slippers from the hospital, because his clothing had been seized. The police gave him two bags of potato chips and water and detained him with other prisoners in a holding cell furnished only with a wooden bench.

## B. *PROCEDURAL HISTORY*

### 1. *Indictment and Pretrial Hearing*

A Bronx County Grand Jury returned an indictment charging Delesline with three counts of attempted murder in the second degree in violation of NYPL § 110/125.25(1). Following a hearing on the legality of the police's stop of Delesline and the subsequent interrogation, the Trial Court, by a decision and order dated June 20, 2005, found that the police had reasonable suspicion to pursue Delesline. The Trial Court suppressed the pre-*Miranda* Lincoln Hospital Statements, but it determined that the Stationhouse Statements given approximately sixteen hours later were voluntary, the result of a knowing and intelligent waiver of Delesline's *Miranda* rights, and not tainted by the suppressed Lincoln Hospital Statements.

### 2. *The Trial*

At trial, the prosecution theorized that the shootings were committed as part of gang activity and that two of the men seen in the surveillance footage of 2280 Randall Avenue were Delesline's brothers, Randy Hall and Lateef Hall. In his Stationhouse Statements, Delesline referred to one of his accomplices as "OG Up North." The prosecution contended that Randy Hall was "OG Up North." At trial, Detective Tozzi testified that Ieshia Hall, the sister

of Delesline and Randy Hall, had identified "OG Up North" as being known also as "Ruckus." Detective Tozzi subsequently determined through a gang intelligence computer system that Randy Hall was "Ruckus." At trial, however, Ms. Hall denied that she made such statements to Detective Tozzi. Delesline testified that Randy Hall's nickname was "Ruck" but denied that this nickname was short for "Ruckus" or "OG Ruk."

In order to rebut this testimony and establish that the "OG Up North" in Delesline's Stationhouse Statements was Randy Hall, the prosecution called Detective Sonny Sankhi ("Detective Sankhi"), who was not involved in the investigation of Delesline and had no personal knowledge about the case. Detective Sankhi testified that he had previously interviewed Randy Hall in the course of a separate investigation in October 2004, during which interview Randy Hall informed Detective Sankhi that he was a member of the Crips gang, held the position of "original gangster" or "OG," and was also known as "Ruk" and "OG Ruk." According to Detective Sankhi, the term "Up North" refers to someone who has served time in an upstate prison, and Randy Hall had served time upstate before 2004. He identified Randy Hall from two pictures taken from a video called "Slash for Life," a video about slashing people while in prison. Additionally, Detective Sankhi identified a photograph of burn marks on Delesline's arms and testified that the marks were consistent with gang markings made upon initiation into a gang, indicating that the member had killed someone previously.

Defense counsel objected to this testimony both before Detective Sankhi took the stand and during his testimony. The Trial Court overruled the objections both times, allowing it as rebuttal testimony regarding

the nicknames used by Randy Hall and whether he was the person identified in the testimony of other witnesses, including that of Delesline.

### 3. *Verdict and Appeal*

On April 5, 2007, a jury convicted Delesline of three counts of attempted murder in the second degree. The Trial Court sentenced Delesline to concurrent prison terms of twenty-five years for each count and five years of post-release supervision.

In April 2008, Delesline appealed his conviction to the New York State Supreme Court, Appellate Division, First Judicial Department ("Appellate Division"), where he raised four claims. First, he claimed that Detective Sankhi's testimony had been admitted improperly, because it was irrelevant, unfairly prejudicial and inflammatory, and contained improper hearsay and opinion testimony. Second, Delesline argued that his Stationhouse Statements were made involuntarily and in violation of his *Miranda* rights. Third, Delesline contended that the police lacked reasonable suspicion when they pursued him initially and therefore that the evidence seized as a result of the resulting detention should be suppressed. Fourth, he argued that the Trial Court imposed an excessive sentence of imprisonment. On June 10, 2008, the Appellate Division unanimously affirmed Delesline's conviction, *see People v. Delesline*, 52 A.D.3d 302, 859 N.Y.S.2d 440 (1st Dep't 2008), and on September 17, 2008, the New York Court of Appeals denied leave to appeal. *See People v. Delesline*, 11 N.Y.3d 787, 866 N.Y.S.2d 614, 896 N.E.2d 100 (2008).

Proceeding pro se, Delesline initially filed a § 2254 petition in this Court on November 24, 2009. On May 28, 2010, the Court appointed an attorney at the Office of the Appellate Defender to represent Delesline. Delesline subsequently filed an amended version of his § 2254 petition, the instant Petition, on July 14, 2010.

## II. *DISCUSSION*

### A. *LEGAL STANDARD FOR HABEAS RELIEF*

#### 1. *Exhaustion*

■ A petitioner in custody pursuant to a judgment of a state trial court is entitled to federal habeas relief only if he has exhausted all available state court remedies. *See* 28 U.S.C. § 2254(b)-(c). A claim has been exhausted if it was fairly presented in state courts, thereby giving the state the "opportunity to pass upon and correct" alleged violations of federal rights. *Duncan v. Henry*, 513 U.S. 364, 365, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995) (*quoting Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971)). A petitioner need not have cited "book and verse on the federal Constitution" in his claim in state court for the claim to have been exhausted. *Picard*, 404 U.S. at 278, 92 S.Ct. 509. Instead, a petitioner may have fairly presented his claim to state courts through

> (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

*Daye v. Attorney Gen. of the State of N.Y.*, 696 F.2d 186, 194 (2d Cir.1982).

#### 2. *Independent and Adequate State Grounds*

■ A federal court's authority to review a habeas petition also depends on whether the state court adjudicated the

petitioner's claims on the merits or on state procedural grounds. *See Coleman v. Thompson*, 501 U.S. 722, 729–30, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). A claim resolved on independent and adequate state procedural grounds is generally not subject to habeas review. *See id.*

■ A claim resolved in state court on the merits, however, may be subject to habeas review. A state court resolves a claim on the merits when it reduces its disposition to a final judgment with res judicata effect on substantive rather than procedural grounds. *See Sellan v. Kuhlman*, 261 F.3d 303, 311–12 (2d Cir.2001); *see also Castillo v. Walsh*, 443 F.Supp.2d 557, 562 (S.D.N.Y.2006).

### 3. *Substantive Grounds for Federal Habeas Relief*

■ Federal habeas review of state court decisions is governed by the standard set forth in the Anti–Terrorism and Effective Death Penalty Act of 1996, 28 U.S.C. §§ 2241–55 ("AEDPA"). AEDPA provides that

[a] district court shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a). Accordingly, a petitioner must demonstrate that his state court conviction violated federal law. *See Di Guglielmo v. Smith*, 366 F.3d 130, 136–37 (2d Cir.2004) (*citing Estelle v. McGuire*, 502 U.S. 62, 68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991)).

Not every alleged violation of federal law, however, will warrant the issuance of a writ of habeas corpus. *See Thurman v. Allard*, No. 01 Civ. 8746, 2004 WL 2101911, at *11 (S.D.N.Y. Sept. 22, 2004). Where a state court has decided a petition-

er's federal claims on the merits, a court may grant habeas relief only if the state court's decision either:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

■ For the purposes of federal habeas review, "clearly established federal law" refers to the holdings, as opposed to dicta, of Supreme Court decisions in effect at the time of the relevant state court decision. *See Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court decision is "contrary to clearly established federal law" within the meaning of § 2254(d) if a state court decision contradicts relevant Supreme Court precedent or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from the Supreme Court." *Id.* at 405–06, 120 S.Ct. 1495. Under this standard, as long as the state court decision applies the correct legal rule to the petitioner's facts, it is not subject to habeas review, even if the federal court would have reached a different conclusion if it were to apply the rule itself. *See id.* at 406, 120 S.Ct. 1495.

■ A state court decision is based on an "unreasonable application of clearly established federal law" if the court correctly identifies the legal rule set forth in governing Supreme Court cases, but unreasonably applies the rule to the particular facts of the case. *See id.* at 412–13, 120 S.Ct. 1495. A federal court may grant

habeas relief only where the state court decision, as it pertains to any issue of federal law, was objectively unreasonable in light of relevant precedent. *See id.* at 409, 120 S.Ct. 1495. In construing and applying federal law, even erroneous state court decisions, if deemed reasonable, will survive habeas review. *See id.* at 411, 120 S.Ct. 1495. However, the state court decision need not be "so far off the mark as to suggest judicial incompetence" before habeas relief may be granted. *Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir.2000) (internal quotation marks omitted). Thus an unreasonable application "falls somewhere between 'merely erroneous and unreasonable to all reasonable jurists.'" *Jones v. Stinson,* 229 F.3d 112, 119 (2d Cir.2000) (*quoting Francis S.,* 221 F.3d at 109).

## B. *APPLICATION*

Delesline argues that (1) his Stationhouse Statements were involuntary and made in violation of his *Miranda* rights (the "Stationhouse Statements Claim"), (2) the testimony of Detective Sankhi was inflammatory, irrelevant, and prejudicial (the "Due Process Claim"), and (3) constituted improper hearsay that violated his rights under the Confrontation Clause (the "Confrontation Clause Claim").

### 1. *The Due Process Claim*

The Appellate Division rejected Delesline's Due Process Claim, and Respondent asserts that Delesline did not fairly present it in state court as a federal constitutional claim, thereby precluding habeas review. In addition, Respondent argues that this claim is not cognizable on habeas review because it solely concerns a state evidentiary ruling. The Court finds that Delesline failed to exhaust the Due Process Claim in state court by "fairly presenting" it as a federal constitutional question. *See* 28 U.S.C. § 2254(b). Because

Delesline cannot now seek state court review of this federal claim, the Court will deem it procedurally defaulted for habeas review.

At trial, Delesline objected that Detective Sankhi's testimony would be "totally collateral" and "simply inflammatory" and improper as rebuttal evidence. (*See* Habeas Opp. at 22.) The Trial Court disagreed, finding that the proffered testimony was proper rebuttal evidence. The Appellate Division concluded that the inclusion of this testimony was not inflammatory or unduly prejudicial. Delesline argues that he fairly presented a federal constitutional question to the state courts when he objected to Detective Sankhi's testimony in its entirety before the Trial Court and presented the Appellate Division with a "factual matrix" that Detective Sankhi's testimony deprived him of a fundamentally fair trial as guaranteed by Due Process Clause.

Nevertheless, "the exhaustion requirement is not automatically satisfied every time an alleged trial error is claimed to deny a defendant a 'fair trial,'" as the unfair trial claim implies a claim under state law rather than the Constitution. *Kirksey v. Jones,* 673 F.2d 58, 60 (2d Cir. 1982). Generic assertions of the denial of a "fair trial" state a constitutional claim only where the defendant conveys a "factual matrix that is well within the mainstream of due process adjudication." *Daye,* 696 F.2d at 193 (internal quotations and citations omitted). For example, if a defendant

claimed that he was accused of one crime but convicted of an entirely different crime and hence was denied a fair trial, no reasonable jurist would doubt that the defendant's claim implicated his constitutional right to due process of law. In contrast, a defendant's claim that he was deprived of a fair trial be-

cause of the admission in evidence of a statement objectionable as hearsay would not put the court on notice that the defendant claimed a violation of his constitutional right to be confronted by his accusers.

*Id.*

■■■ Delesline's arguments to the Appellate Division that he was denied a fundamentally fair trial due to the admission of Detective Sankhi's testimony were insufficient to put the state court on notice that Delesline claimed a violation of his federal constitutional rights. *See Gray v. Netherland,* 518 U.S. 152, 163, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996) (stating that "it is not enough to make a general appeal to a constitutional guarantee as broad as due process to present the 'substance' of such a claim to a state court"). In his briefs to the Appellate Division, Delesline failed to cite any federal constitutional provisions or to assert his claims "in terms so particular as to call to mind a specific right protected by" the constitution. *See Daye,* 696 F.2d at 194.

Delesline argues that he fairly presented his federal constitutional claim to the Appellate Division because he cited two state cases discussing "the fundamental right to a fair trial" in his reply brief. These cases were cited, however, only for the proposition that the Appellate Division should grant interest of justice review to claims that Delesline had failed to preserve in the Trial Court. (*See* App. Div. Reply Brief at 3.) Furthermore, both cases discuss the right to a fair trial under state law, not the federal constitution. *See People v. Collins,* 12 A.D.3d 33, 784 N.Y.S.2d 489 (1st Dep't 2004); *People v. Nevedo,* 202 A.D.2d 183, 608 N.Y.S.2d 422 (1st Dep't 1994). In fact, Delesline relied on no state or federal authority "employing pertinent constitutional analysis." *See Daye,* 696 F.2d at 194. Consequently, the Court finds that Deles-

line did not "fairly present" the Due Process Claim to the state court and, therefore, the claim is not subject to federal habeas review. *See Duncan,* 513 U.S. at 365, 115 S.Ct. 887.

■■■ Even assuming, however, that Delesline's Due Process Clause Claim were properly before the Court, the Court would still deny it on the merits. Generally, state evidentiary rulings do not implicate the federal constitution, *see Dunnigan v. Keane,* 137 F.3d 117, 125 (2d Cir. 1998), but are instead left to the discretion of the trial court. *See McGuire,* 502 U.S. at 71–72, 112 S.Ct. 475. Only the introduction of improper evidence that "is so extremely unfair that its admission violates fundamental conceptions of justice" denies a defendant's right to due process and is reviewable by the habeas court. *Dunnigan,* 137 F.3d at 125 (*quoting Dowling v. United States,* 493 U.S. 342, 352, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990)). Evidence improperly admitted is "so extremely unfair" when it is "sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." *Id.* (*quoting Johnson v. Ross,* 955 F.2d 178, 181 (2d Cir.1992)). The Court considers the evidentiary ruling in light of the whole record. *See id.*

■■■ Under this standard, Delesline's Due Process Clause Claim fails. Detective Sankhi's testimony was relevant to issues raised at trial regarding Randy Hall's involvement in the shooting and properly admitted to rebut evidence introduced by Delesline. The Court is persuaded that in light of Delesline's Stationhouse Statements and the surveillance footage, the exclusion of this evidence would not have altered the outcome of the trial.

2. *The Confrontation Clause Claim is Procedurally Defaulted*

The Appellate Division ruled that Delesline did not preserve his Confrontation Clause Claim because he failed to object at trial, but that court nevertheless rejected the claim on the merits. *See Delesline,* 859 N.Y.S.2d at 441. Delesline neither offers cause for this procedural default nor asserts actual innocence. As the state courts resolved this claim on independent and adequate state procedural grounds, it is not subject to habeas review.

■ A procedural default such as a failure to preserve an objection constitutes an adequate and independent ground for the state court decision. *See Peterson v. Scully,* 896 F.2d 661, 663 (2d Cir.1990) (noting that a defendant's failure to comply with New York's "contemporaneous objection rule," generally bars habeas review on the merits of the claim).

■ That said, there are limited circumstances where a federal court may conduct a habeas review of claims even though they were resolved on state procedural grounds. Federal review is permissible if the petitioner can demonstrate any one of the following circumstances: (1) actual innocence of the crime charged resulting in a "fundamental miscarriage of justice," *Dunham v. Travis,* 313 F.3d 724, 730 (2d Cir.2002) (*citing Schlup v. Delo,* 513 U.S. 298, 321, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995)); (2) cause for the procedural default resulting in prejudice, *see*

Edwards v. Carpenter, 529 U.S. 446, 451, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000); or (3) that the procedural bar that the state court applied is not adequate, *see Cotto v. Herbert,* 331 F.3d 217, 239 (2d Cir.2003).

■ None of the exceptions to the independent and adequate state grounds doctrine apply here. First, the independent state grounds relied upon are clearly adequate under Second Circuit precedent. Second, Delesline does not demonstrate either cause for, or actual prejudice resulting from, his failure to preserve his claim.[2] Delesline has not asserted, and the record does not reflect, anything that impeded him from preserving this claim. Finally, Delesline has not demonstrated that the Court's failure to consider the claim will result in a miscarriage of justice. Because the Appellate Division clearly and expressly relied upon an independent and adequate state law procedural rule when it addressed Delesline's challenge to the Trial Court's evidentiary ruling, the Court concludes that the Confrontation Clause Claim is procedurally defaulted.

■ Even if Delesline's Confrontation Clause Claim were not procedurally defaulted, the Court would deny it on the merits. The Confrontation Clause is implicated by testimonial statements only and "applies to 'witnesses' against the accused." *See Crawford v. Washington,* 541 U.S. 36, 51, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Thus, even the admission of a hearsay statement[3] will not violate the

---

**2.** Because Delesline lacks cause for the procedural default, the Court need not consider whether he is prejudiced by his inability to raise the alleged constitutional violation stemming from the Trial Court's evidentiary ruling. *See McCleskey v. Zant,* 499 U.S. 467, 502, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991) (concluding that prejudice need not be considered where there is no cause for procedural default).

**3.** Detective Sankhi's testimony regarding Randy Hall's purported statement to him regarding his name and gang affiliation were hearsay in that they were out-of-court statements "offered for the truth of the fact asserted in [them]," i.e., that Randy Hall had said he was known as "Ruk" and "OG Ruk" and that he was a gang member. *See* Richardson on Evidence, 11th ed., § 8–101. Therefore, the fact that these out-of-court statements

**500**

Confrontation Clause unless this statement is testimonial. *See id.* (noting that "not all hearsay implicates the Sixth Amendment's core concerns"). While the Supreme Court has declined to provide a "comprehensive definition" of testimonial statements, it indicated that the definition includes "material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially." *Id.* at 51, 124 S.Ct. 1354 (internal quotations and citations omitted).

■ In the context of a police interrogation, statements are testimonial "when the circumstances objectively indicate that ... the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis v. Washington,* 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). In *Davis,* the Supreme Court held that a domestic violence victim's statements to a 911 operator in which she identified the defendant were not testimonial, because the "primary purpose" of the statements at the time they were made "was to enable police assistance to meet an ongoing emergency." *Id.* at 828, 126 S.Ct. 2266. By contrast, *Davis* also held that a different domestic violence victim's written statements to police officers after the emergency had dissipated were testimonial, because "the interrogation was part of an investigation into possibly criminal past conduct." *Id.* at 829, 126 S.Ct. 2266.

In *United States v. Burden,* the Second Circuit examined how an out-of-court declarant's subjective intent bears upon whether his out-of-court statements are testimonial. *See* 600 F.3d 204 (2d Cir. 2010). The Court held that there was no Confrontation Clause violation where the government introduced statements made by a confidential informant ("CI") recorded from a wire he was wearing. *Id.* at 225. Although the CI was aware that his statements were being recorded and could later be used against the defendant at trial, nothing that the CI "said was spoken for the purpose of accusing." *Id.* The Second Circuit interpreted *Davis* as not being limited in its applicability by "the exigency of the circumstances there," but instead to stand for the "broader significance" that "the declarant's purpose in speaking" is relevant. *Id.* Thus, the CI was similar to the domestic violence victim speaking to a 911 operator because "his purpose was non-accusatory." *Id.; see also United States v. Cromer,* 389 F.3d 662, 675 (6th Cir.2004) ("The proper inquiry ... is whether the declarant intends to bear testimony against the accused.").

■ Although Randy Hall's statements to Detective Sankhi were closer to the kind of formal statements at issue in *Crawford* than the wiretap statements in *Burden,* Randy Hall's statements were nevertheless not testimonial. Here, only a limited portion of Randy Hall's hearsay statements were introduced, and these statements were not "spoken for the purpose of accusing" Delesline of any crime. *See Burden,* 600 F.3d at 225. Detective Sankhi simply testified that Randy Hall had said that his own name was "Ruk" and

---

were introduced to rebut evidence introduced by Delesline does not affect the hearsay analysis, as Respondent contends. *See Tennessee v. Street,* 471 U.S. 409, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985) (holding that non-testifying co-defendant's confession was not hearsay when it was introduced to rebut defendant's

claim that his confession was coerced and derived from co-defendant's confession, because confession was used only to show differences between the two confessions and not offered to prove the truth of the assertions therein).

"OG Ruk" and that he was a gang member. Detective Sankhi was not investigating Delesline's case, and there is no evidence that Randy Hall even mentioned Delesline during this interview in October 2004. As Randy Hall did not intend his statements regarding his identity to be used as testimony against Delesline, they were not testimonial and did not violate Delesline's Confrontation Clause rights.

Therefore, the admission of Detective Sankhi's testimony regarding Randy Hall's out-of-court statements was not an unreasonable application of clearly established Supreme Court precedent. *See* 28 U.S.C. § 2254(d).

## C. *DELESLINE'S STATIONHOUSE STATEMENTS CLAIM*

■■■■■ The Court must address only the question of whether the state's decision regarding Delesline's Stationhouse Statements Claim was "contrary to" or "an unreasonable application of" clearly established federal law or resulted in a decision "based on an unreasonable determination of the facts." *See* 28 U.S.C. § 2254(d).[4] The test of a confession's voluntariness is whether an examination of all of the circumstances demonstrates that the conduct of "law enforcement officers was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined...." *Rogers v. Richmond,* 365 U.S. 534, 544, 81 S.Ct. 735, 5 L.Ed.2d 760

(1961). To determine voluntariness, a court should look to the totality of the circumstances in which the confession was given. *See Arizona v. Fulminante,* 499 U.S. 279, 282–89, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). The relevant factors include the defendant's background and experience, the conditions of his interrogation, and the conduct of the law enforcement officers. *See United States v. Ruggles,* 70 F.3d 262, 265 (2d Cir.1995).

■■■■■ While the Supreme Court has not held that a lengthy delay between arrest and arraignment is in itself a constitutional violation, it may be considered as a factor bearing upon the voluntariness of the defendant's statements.[5] *See Fikes v. Alabama,* 352 U.S. 191, 197, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957). "No single criterion controls whether an accused's confession is voluntary: whether a confession was obtained by coercion is determined only after careful evaluation of the totality of the surrounding circumstances." *Green v. Scully,* 850 F.2d 894, 901 (2d Cir.1988); *see Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The totality of the surrounding circumstances are evaluated "to determine whether the government agents' conduct was such as to overbear [a defendant's] will to resist and bring about confessions not freely self-determined." *United States v. Kaba,* 999 F.2d 47, 51 (2d Cir.1993) (quotations omitted). "The factors to be

---

**4.** There is no dispute that Delesline exhausted all available state court remedies regarding his Stationhouse Statements Claim.

**5.** Delesline cites *Corley v. United States,* —— U.S. ——, 129 S.Ct. 1558, 1571, 173 L.Ed.2d 443 (2009) in an attempt to bolster his argument that the delay in his arraignment rendered his statements involuntary. As Delesline concedes, however, *Corley* held only that Federal Rule of Criminal Procedure 5(a) ("Rule 5(a)") requires the suppression of statements where there is an "unreasonable

or unnecessary" delay in presenting a defendant to a magistrate after arrest. *Id.* The Supreme Court has not held that this suppression is constitutionally required and noted that Rule 5(a) makes "even voluntary confessions inadmissible if given after an unreasonable delay in presentment." *Id.* at 1567. Therefore, *Corley* is inapposite as to whether the delay in Delesline's arraignment rendered his statements involuntary under the Due Process Clause.

considered include the type and length of questioning, the defendant's physical and mental capabilities, and the government's method of interrogation." *United States v. Alvarado*, 882 F.2d 645, 649 (2d Cir. 1989) (quotations omitted). The only "necessary predicate to the finding that a confession is not 'voluntary' " is "coercive police activity." *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

Delesline argues that his statement was involuntary because he was held in custody for nearly twenty-four hours, denied a meal and the opportunity to sleep, and forced to wear a hospital "gown." The length of Delesline's detention and the fact that he was only provided with two bags of potato chips and a bottle of water presents an arguable issue as to voluntariness. Nevertheless, even if the state court's application of federal law were erroneous, this Court can grant habeas relief only where the decision was objectively unreasonable in light of relevant precedents or based on an unreasonable determination of the facts. *See Williams*, 529 U.S. at 409, 120 S.Ct. 1495.

Given that Delesline was given some snacks and water during his confinement, had the opportunity to sleep in the stationhouse cell before his interrogation, and was interrogated for only a little over an hour, the state court record supported the finding by a totality of circumstances that Delesline's statements were given voluntarily. *See Diaz v. Senkowski*, 76 F.3d 61, 63 (2d Cir.1996) (holding that defendant's statements were voluntary where he was interrogated for four hours and there was no evidence that he was denied food, bathroom access, or sleep and was not beaten, otherwise abused, or handcuffed); *Holland v. Donnelly*, 216 F.Supp.2d 227, 234 (S.D.N.Y.2002) (upholding on habeas review state court determination that confes-

sion was voluntary where defendant was detained for 19 hours and held overnight in a conference room without a bed but offered food and the opportunity to use the restroom and no force or coercive tactics were employed in interrogation).

 Additionally, the fact that Delesline's Lincoln Hospital Statements were suppressed for failure to comply with *Miranda* does not mean that his Stationhouse Statements made 16 hours later must be suppressed. *See Oregon v. Elstad*, 470 U.S. 298, 314, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) ("A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement.").

 In determining the voluntariness of the post-*Miranda* Stationhouse Statements here, the Court "must examine the totality of the circumstances" to determine "whether the circumstances surrounding petitioner's unwarned confession were so coercive as to prevent him from making a subsequent knowing and voluntary waiver of his rights, thereby requiring the suppression of his post-*Miranda* confession." *Parsad v. Greiner*, 337 F.3d 175, 183 (2d Cir.2003). The Supreme Court has laid out a number of factors to consider: "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." *See Missouri v. Seibert*, 542 U.S. 600, 615, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004).

 Where law enforcement officers use a deliberate two-step process to obtain an unwarned confession and then

issue *Miranda* warnings before obtaining a recitation of this confession, the subsequent statement must be suppressed unless curative measures were taken. *See United States v. Carter*, 489 F.3d 528, 536 (2d Cir.2007). In order to determine if the circumvention of the *Miranda* warnings was deliberate, "a court should review the totality of the objective and subjective evidence surrounding the interrogations ... with a recognition that in most instances the inquiry will rely heavily, if not entirely, upon objective evidence." *United States v. Capers*, 627 F.3d 470, 479 (2d Cir.2010). Even if deliberateness is established, a court can consider whether any "curative measures intervened to restore the defendant's opportunity voluntarily to exercise his *Miranda* rights" prior to making his second statement. *Id.* at 484, 86 S.Ct. 1602. Curative measures include "(1) a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning, and (2) an additional warning that explains the likely inadmissibility of the prewarning custodial statement." *Id.* (*quoting Seibert*, 542 U.S. at 622, 124 S.Ct. 2601 (Kennedy, J., concurring)).

Here, the Lincoln Hospital Statements were brief—Delesline claimed that he had been at the scene of the shooting only to "buy weed" and ran because he had open arrest warrants and was carrying a gun. Although these statements were unwarned, there is no evidence that they were coerced, thereby rendering subsequent statements involuntary. When Delesline gave his Stationhouse Statements, Detective Tozzi had referred to the Lincoln Hospital Statements only to indicate that he did not believe them to be truthful. Despite this brief reference to the Lincoln Hospital Statements, there was little overlap between the content of the Lincoln Hospital Statements and the Stationhouse Statements. The Station-

house Statements were taken sixteen hours later, in the police stationhouse rather than a hospital room, and were considerably more detailed than the brief Lincoln Hospital Statements. Furthermore, there is no evidence that Detective Tozzi used a deliberate two-step process to obtain an unwarned confession followed by a post-*Miranda* recitation of that same confession. Therefore, the state court's determination that Delesline's Stationhouse Statements were admissible was not premised on an unreasonable determination of the facts and was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent. *See* 28 U.S.C. § 2254(d).

## III. ORDER

For the reasons stated above, it is hereby

**ORDERED** that the amended petition dated July 14, 2010 of Petitioner Jomo Delesline ("Delesline") for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is DENIED.

As Delesline has not made a substantial showing of a denial of a constitutional right, a certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c); *Lucidore v. New York State Div. of Parole*, 209 F.3d 107, 111–13 (2d Cir.2000).

The Clerk of Court is directed to terminate any pending motions and to close this case.

**SO ORDERED.**