******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

EVELEIGH, J., dissenting in part. Although I join parts I A and II of the majority opinion, I respectfully disagree with part I B of the majority opinion and, therefore, respectfully dissent in part. Specifically, I agree with the state that there is sufficient evidence of an enterprise under an association in fact theory and participation in that enterprise by the defendant, Richard Bush, to sustain his conviction for racketeering under General Statutes § 53-395 (c). I conclude that the jury reasonably could have found that the state had proven beyond a reasonable doubt the existence of an association in fact between the defendant and the six other drug dealers who sold narcotics from the porch of his Bridgeport home. Therefore, I would reverse the judgment of the Appellate Court on the charge of racketeering under the Corrupt Organizations and Racketeering Activity Act (CORA), General Statutes § 53-393 et seq.

I agree with the majority that an association in fact enterprise requires proof of: "(1) a purpose, (2) relationships among those associated with the enterprise and (3) longevity sufficient to permit the associates to pursue the purpose of the enterprise . . . ." (Citation omitted.) *State* v. *Rodriguez-Roman*, 297 Conn. 66, 82, 3 A.3d 783 (2010). I further agree that "evidence of an ascertainable structure that exists for a purpose [b]eyond that inherent in the pattern of racketeering activity" is not required; (internal quotation marks omitted) id.; and that "the requirements for proving an association in fact enterprise *do not* include a hierarchical structure, fixed roles for its members, a name, regular meetings, dues, established rules and regulations, disciplinary procedures and induction or initiation ceremonies." (Emphasis added.) Id., 82–83. Rather, as the majority notes, an association in fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct that could be proven by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." (Internal quotation marks omitted.) Id., 82; see also id., 83–84 (jury reasonably could have found that defendant and coconspirator "entered into an association . . . for the purpose of issuing fraudulent licenses to illegal immigrants in exchange for a substantial fee"). After examining all of the evidence and the reasonable inferences therefrom, I would conclude that, viewed in the light most favorable to the state, the evidence in the record establishes that the defendant sold cocaine himself and facilitated the sale of cocaine by six other drug dealers, namely, David Moreland, Jason Ortiz, Willie Brazil, Raymond Mathis, Carlos Lopez, and Kenneth Jamison, from the porch of his duplex home on Pembroke Street in Bridgeport over an approximately six month period from June

25 through November 9, 2010.

As the majority acknowledges, in the present case, there is no question that prongs one and three of the test set forth in *Rodriguez-Roman* have been satisfied. It is undisputed that the association had one main purpose—the sale of narcotic drugs. Further, the parties do not dispute the fact that the length of time, approximately five to six months, was sufficient to permit the associates to pursue the purpose of the enterprise. Consequently, my main disagreement with the majority centers on the relationships of those associated in the enterprise. In answering this question, which concerns prong two of the test, it is especially necessary to examine the relationship of the defendant to the other people in the group. In performing this analysis, in my view, it is critical to examine not only the direct evidence of the association but also the inferences that the jury reasonably could have drawn from all of the evidence, including the exhibits and tapes that the police had made of the drug purchases.

Evidence demonstrating the cooperative endeavor between the defendant and the six other dealers begins with the transaction on June 25, 2010. Specifically, David Hannon, a police informant, went to the corner of Ogden and Pembroke Streets to make a controlled narcotics purchase from the defendant. Before Hannon arrived, Sergeant Jason Amato saw the defendant in front of his house, standing with Moreland and Mathis. The defendant then left. When Hannon arrived, Moreland told Hannon that the defendant had gone to the police station to seek victims' compensation for injuries he had sustained in a shooting. Thereafter, Moreland went to the porch of the defendant's home to obtain cocaine from Mathis, and then Hannon purchased that cocaine from Moreland.

The jury also found a sale on June 30, 2010, to be one of the two predicate acts in the pattern of racketeering. In the course of setting up the sale by telephone, Hannon called Ortiz, an "associate" of the defendant. After Hannon set up the sale with Ortiz, the defendant called Hannon to ask why he had not yet arrived at the meeting point. When Hannon did arrive, he called the defendant. The Appellate Court described the transaction that ensued as follows: "When Hannon arrived at the defendant's home, the defendant emerged from his backyard, walked past Hannon's vehicle while looking inside it, then continued to the street corner, where he gestured to Ortiz by raising his hand in the air. Ortiz then approached Hannon's vehicle and opened the door, whereupon the defendant came up behind Ortiz, reached inside the vehicle, and tapped hands with Hannon. Hannon gave Ortiz money, in exchange for which Ortiz gave Hannon the blue bag of cocaine that had been in his mouth. Meanwhile, another man approached the defendant. After completing the transaction with

Hannon, when the defendant gestured to him once again, Ortiz handed something to the other man in exchange for money. Ortiz and the defendant then walked together toward the defendant's backyard." *State* v. *Bush*, 156 Conn. App. 256, 264, 112 A.3d 834 (2015).

In relation to the June 30 sale, the jury reasonably could have concluded that the surveillance videotape showed the defendant exit his backyard, look for Ortiz, and command Ortiz with a hand gesture to get off his porch and attend to Hannon. While Ortiz was in Hannon's vehicle completing the transaction, a man approached the defendant while the defendant stood outside Hannon's vehicle overseeing Ortiz' sale. The defendant made another gesture to Ortiz and, in response, Ortiz sold drugs to the unidentified man. After the sales were complete, the defendant and Ortiz walked together to the defendant's backyard. In my view, this evidence demonstrates that these sales were not independent isolated events. Ortiz certainly responded to the direction and control of the defendant. In fact, a jury could have reasonably concluded that, aside from the collection of drug dealers assembling at the defendant's house, the defendant controlled the activities of the enterprise.

The jury reasonably could have found that two other sales over the summer also established the association between the defendant and the other dealers. In particular, sales made on August 6 and August 24, 2010, demonstrate the association between the defendant and other dealers. First, prior to the sale made on August 24, Hannon made a telephone call to the defendant's home telephone number, which the defendant had given to Hannon after selling him cocaine on August 6. Moreover, in order to accomplish the August 24 sale to Hannon, the defendant obtained cocaine from Lopez, who was on the front porch of the defendant's home at the time of the sale. These sales demonstrate that the defendant and the other dealers were in communication with each other and shared customers and drugs to sell.

Moreover, I would conclude that the sale on November 9, 2010, is particularly indicative of the ongoing criminal association between the various actors in this case. First, Hannon called the defendant with a number that he previously had used to contact Ortiz. The Appellate Court described the transaction as follows: "When Hannon arrived at the defendant's home, the defendant was standing on the street corner with . . . Brazil. The defendant got into Hannon's vehicle, and he and Hannon drove off. During their ride, the defendant made a . . . call in an apparent attempt to procure cocaine, which Hannon had requested. After the call, Hannon and the defendant drove back to the defendant's home. On the way back, Hannon told the defendant that he also wanted to buy a gun, which the defendant said

was 'doable.' When they returned, Hannon dropped off the defendant to speak to Brazil, then pulled around the corner onto Pembroke Street, as the defendant had directed. Once he did so [Moreland] approached Hannon's vehicle. When Hannon told Moreland that he had given money to the defendant, Moreland gave Hannon a quantity of cocaine. The defendant later called Hannon to confirm that Moreland had given him the cocaine and to discuss further his stated interest in purchasing a gun." Id., 265.

On the basis of this evidence, the jury reasonably could have also found that the defendant was the contact person for buying cocaine at the corner of Pembroke and Ogden Streets. All of the controlled buys orchestrated by the task force were scheduled with telephone calls to either the defendant's house or a cell phone that the defendant shared with at least one other dealer. The defendant's association to the drug dealing enterprise was also established by the audiotape surveillance that captured his warnings and boastings. During the July 14 sale, when Hannon introduced Dennis Sang, an undercover police detective, to the defendant as a buyer, the defendant assured Sang: "You'll be alright man, I live right here man . . . just don't bring no . . . cops and we all right." During the July 16 sale, the defendant bragged to Hannon and Sang that they had nothing to fear when he was around. Also, during the November 9 sale, when Hannon told the defendant that he wanted to purchase a gun, the defendant told Hannon that was "doable."

Additionally, the jury reasonably could have inferred the defendant's association to the enterprise from his testimony. He testified that Ortiz and Moreland were his "associates," that he sold drugs, and that he bought drugs from the candy store. He also testified that he never called the police on dealers who were selling from his porch because he "don't tell on" anybody. In addition, he testified that he was friendly with the "younger guys" who dealt drugs from his porch, so much so that they gave him free samples to test the quality of their product.

Finally, the jury reasonably could have inferred that the defendant took steps to protect the arrangement with the six other dealers. First, on July 14, he admonished Hannon, who at the time was accompanied by Sang, not to bring the police near his house. The defendant testified that he had allowed the other dealers to continue dealing from his porch and that he would not call the police on them. Although there was no evidence of profit sharing among those who dealt narcotics from the defendant's porch, and the defendant himself denied profiting from drug dealing, he nevertheless testified that he helped facilitate the other dealers' sales in order to obtain narcotics as gratuities, which he used to support his own addiction. Indeed, he described two of the

dealers in particular, namely, Moreland and Ortiz, as his "associates."[1]

This pattern of cooperation and support between the defendant and the dealers whom he permitted to sell narcotics from a common location, the front porch of his home, facilitated by the use of common or shared telephones, supports the jury's inference that an enterprise existed. This conclusion is supported by federal court decisions under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 et seq. For example, in holding that an apparent street gang, although lacking a hierarchical structure or colors, constituted a RICO enterprise, the United States Court of Appeals for the First Circuit observed that the group "had a sufficiently well-defined shape to constitute an enterprise in the requisite sense. [It] exhibited group cohesion over time; its membership pooled and shared resources; the individuals involved had a sense of belonging and self-identified as . . . members; and the group had a well-honed set of goals. We think that this is enough, if barely, to constitute a RICO enterprise." *United States* v. *Nascimento*, 491 F.3d 25, 33 (1st Cir. 2007), cert. denied, 552 U.S. 1297, 128 S. Ct. 1738, 170 L. Ed. 2d 543 (2008); see also *United States* v. *Burden*, 600 F.3d 204, 214–16 (2d Cir.) (sufficient evidence of enterprise, despite lack of hierarchy or organization, group had "had multiple members who joined in the shared purpose of selling drugs and promoting such sales" with evidence of common meeting place, orderly activities with one member directing flow of drugs to other dealers and organizing acts of violence, and members engaged in acts of retaliation for violence committed by gangs in area), cert. denied sub nom. *Buchanan* v. *United States*, 562 U.S. 953, 131 S. Ct. 251, 178 L. Ed. 2d 251 (2010); *United States* v. *Payne*, 591 F.3d 46, 60–61 (2d Cir.) (sufficient evidence of enterprise to distribute narcotics in neighborhood, where members acted as " 'street family,' " sold drugs at specific locations, protected those locations with violence, shared funds and narcotics with each other, and aided each other "during periods of incarceration"), cert. denied, 562 U.S. 950, 131 S. Ct. 74, 178 L. Ed. 2d 246 (2010); *United States* v. *Nascimento*, supra, 33 (noting that gang shared weapons, information, and "acted on behalf of one another by attempting to assassinate witnesses to each other's crimes"); *United States* v. *Connolly*, 341 F.3d 16, 27 (1st Cir. 2003) ("[The defendant and his associates] worked together in an [association in fact] enterprise over a period of almost two decades, joining forces to protect themselves from prosecution and to further other criminal activities—some alleged in the indictment, and others not specifically alleged. There was cohesion in the group over time; the membership shared resources and revenues; there was, in fact, a sense of membership.").

The defendant, observing accurately that "garden

variety criminal activity undertakings" are not sufficient for liability to attach under racketeering statutes like CORA; (internal quotation marks omitted) *Castillo* v. *State*, 170 So. 3d 112, 117 (Fla. App. 2015), appeal dismissed, Docket No. SC16-164, 2016 WL 374221 (Fla. January 28, 2016); argues that "the evidence merely showed that [he] lived in a home on a corner lot where drug sales occurred and that many people congregated in front of his house. The fact that [he] was [drug dependent] during this time period, and that he always expected and received a 'tribute' when providing drugs to Hannon, coupled with the fact that [he] had to go elsewhere to find drugs for Hannon, show that he obtained the drugs to support his own drug habit and not to further some common purpose of an enterprise." (Footnote omitted.) Although this is not an unreasonable interpretation of the evidence, it is, nevertheless, inconsistent with the jury's verdict. Thus, it runs afoul of the well established precept that, in considering the sufficiency of the evidence, "[w]e do not sit as a thirteenth juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record. . . . Rather, we must defer to the jury's assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude. . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." (Internal quotation marks omitted.) *State* v. *Morgan*, 274 Conn. 790, 800, 877 A.2d 739 (2005). "[O]nce a defendant has been found guilty of the crime charged, a reviewing court conducts its review of all the evidence in the light most favorable to the prosecution. In short, [t]he evidence must be given a construction most favorable to sustaining the jury's verdict."[2] (Internal quotation marks omitted.) Id., 800–801.

The CORA charge in the present case was brought pursuant to § 53-395 (c), which provides in relevant part that it is unlawful for any person "associated with, any enterprise to knowingly conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity . . . ." An "enterprise is 'a group of persons associated together for a common purpose of engaging in a course of conduct,' proved by 'evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.'" *United States* v. *Burden*, supra, 600 F.3d 214; see also General Statutes § 53-394 (c); *State* v. *Rodriguez-Roman*, supra, 297 Conn. 82–83. Pursuant to § 53-394 (a) (16), "'[r]acketeering activity' means to commit, to attempt to commit, to conspire to commit, or to intentionally aid, solicit, coerce or intimidate another person to commit any crime which, at the time of its commission, was a felony chargeable by indictment or information under . . . sections 21a-277, 21a-278 and 21a-279, relating to drugs . . . ."[3]

Pursuant to § 53-394 (e), " 'pattern of racketeering activity' means engaging in at least two incidents of racketeering activity that have the same or similar purposes, results, participants, victims or methods of commission or otherwise are interrelated by distinguishing characteristics, including a nexus to the same enterprise, and are not isolated incidents . . . ."

Viewing the entire evidence, and in the light most favorable to sustaining the verdict, the jury reasonably found: (1) the existence of a drug dealing association in fact enterprise; (2) the defendant knowingly associated himself with that enterprise; and (3) the defendant intentionally participated in the affairs of the enterprise when he committed two acts of racketeering, namely, two felony violations of our drug dependency laws, when he and Ortiz sold cocaine to Hannon on June 30, and when he and Moreland sold cocaine to Hannon on November 9. See *State* v. *Carter*, 243 Conn. 392, 395, 703 A.2d 763 (1997) (factual basis for guilty plea to violations of § 53-395 [b] and [c] included three sales of heroin, acting as lookout for narcotics purveyors, and attempts to flag down vehicles to sell narcotics). On the basis of the surveillance videos contained within the record and the testimony from the witnesses presented at trial, a drug dealing association in fact existed at the defendant's house where he and at least six other dealers sold cocaine from a single location on the east side of Bridgeport.

The jury reasonably could have inferred and found beyond a reasonable doubt that defendant was associated with a drug dealing enterprise because: (1) he lived there; (2) he warned Hannon and Sang not to bring any "cops" around; and (3) he committed two acts of racketeering when he sold cocaine to Hannon with two other dealers on June 30 and November 9. The jury reasonably could have inferred that those two sales constituted a pattern of racketeering activity that had a nexus to the enterprise because both sales: (1) occurred at the same location, namely, the defendant's home; (2) had the same purpose, namely, the sale of cocaine; (3) had similar participants; and (4) began with a call to either the defendant's home telephone, or a cell phone that the defendant shared with at least one other dealer and used to fulfill orders. Also, the jury reasonably could have inferred from the evidence that the sales on June 30 and November 9 were not isolated incidents. The investigation lasted months, during which the task force observed the defendant commit a total of six sales of cocaine.

I respectfully disagree with the majority's conclusion that "there is no evidence that they functioned as a continuing unit or even an informal organization. . . . [T]he evidence . . . does not establish the requisite relationships necessary to sustain a finding of an enterprise. Indeed, it is well short of the evidence that two

United States Courts of Appeal have characterized as minimally sufficient to establish the existence of an association in fact under RICO." Two of the cases cited by the majority to support its conclusion actually affirmed RICO convictions. See *United States* v. *Burden*, supra, 600 F.3d 214–16; *United States* v. *Nascimento*, supra, 491 F.3d 33. In the present case, the group had multiple members who joined in the shared purpose of selling drugs and promoting such sales with evidence of a common meeting place. Further, as demonstrated by the surveillance tapes, the defendant directed the flow of drugs and what dealer should deal with what customer. The defendant also set the ground rules for participating on the porch by stating that no one informs on anyone else and instructed the members not to bring the police. Also, although there is no direct evidence of violence in this case, the defendant, in response to a question posed Hannon, indicated that he could arrange for the purchase of a gun. *United States* v. *Burden*, supra, 215 (recognizing "organizing acts of violence" as evidence of association in fact). Finally, when drugs were needed, it was clear that the defendant would obtain the drugs from other members to make his sale. When one adds the evidence that the defendant's cell phone and home telephone number were used by other dealers to complete other sales, I would conclude that there is no doubt that the jury had more than sufficient evidence upon which to conclude that the defendant was guilty of violating CORA.

I respectfully disagree with the majority's statement that "all that the evidence in the present case proves is an aggregation of apparently friendly individuals involved in various narcotics transactions, with no indication of ties to demonstrate a sustained pattern of cooperation among them." The sharing of cell phones, drugs, meeting places, directions from the defendant, and rules of transaction made by the defendant, belie that description. I further respectfully disagree with the majority's conclusion that "upholding the jury's verdict in the present case would mean that virtually any cooperation by a defendant with others in connection with the sale of narcotics would have the impermissible result of turning 'garden variety criminal activity undertakings' into racketeering punishable under statutes such as CORA." I disagree. There would not be a CORA violation where you had a loose association with no sharing of telephones, no sharing of drugs, no common meeting place, and no direction from one individual. An example of a set of facts that would not justify a CORA violation is given in the majority opinion. *Jackson* v. *State*, 858 So. 2d 1211 (Fla. App. 2003), in my opinion, presents an example of evidence that is not enough to establish either a RICO or a CORA violation. In *Jackson*, a group of dealers were friendly with each other and met in a park to sell drugs. Id., 1212. The defendant in that case was not involved in: (1) sharing drugs; (2)

sharing cell phones; or (3) receiving direction from one member. Under those facts, I would agree that the fact that the members in the group were friendly with each other and sold drugs in the same common public location is not sufficient to establish an association. In the present case, regardless of whether the facts establish that this is a " 'garden variety' " drug operation, I would conclude that conducting such an operation with a group of six other drug dealers on the porch of a private home or adjoining public streets, and dispensing drugs to people stopping in front of the porch as if it were a drive-through window at a twenty-four hour pharmacy, is the very type of activity that CORA was intended to punish. In my view, the majority opinion does not follow our directive to look at the verdict in the light most favorable to sustaining it, and not to act as the thirteenth juror in a case where the jury has already convicted the defendant based upon the sufficient evidence presented at trial.

Accordingly, I respectfully dissent from part I B of the majority opinion.

[1] I acknowledge the state's reliance on the language used to describe the quantities of cocaine purchased, as well as the packaging of that cocaine and the fact that the dealers concealed those packages in their mouths, as evidence of the enterprise. Given the lack of evidence that this language and packaging were unique to the sales conducted from the defendant's porch, and Detective Amato's testimony that they were in fact common to the narcotics trade in the east side of Bridgeport as a whole, I agree with the defendant and the majority that this evidence was not probative of the existence of an enterprise.

[2] I also disagree with the defendant's reliance on *Jackson* v. *State*, 858 So. 2d 1211, 1212 (Fla. App. 2003) (per curiam), wherein the Florida intermediate appellate court concluded that there was insufficient evidence to prove the state's allegation that "the defendant was employed by or associated with a criminal street gang." The court observed in *Jackson* that "[t]here was no evidence that he was a member of either gang; that he engaged in transactions with or on behalf of gang members; or that he shared any of his drug proceeds with the gangs. Rather, the evidence showed only that [the] defendant sold cocaine in the park and that he was familiar with some other persons who were gang members." Id. I view *Jackson* as distinguishable because, viewed in the light most favorable to the state, the evidence in the present case showed that the defendant was a member of an informal association of six other drug dealers who plied their wares from his own porch, and that he had actively participated in some of their sales.

[3] CORA and its federal counterpart, RICO, share a similar purpose and analogous definitions of an association in fact enterprise. *State* v. *Rodriguez-Roman*, supra, 297 Conn. 83.